PALMER PARK THEATRE COMPANY *v.*
CITY OF HIGHLAND PARK.

1. PARTIES—CLASS SUITS—ORDINANCE AS TO AIR CONDITIONERS.
    A class action by 2 theater owners on behalf of themselves and all
        water-rate payers using nonrecirculating air-conditioning equip-
        ment in defendant city against such city to enjoin enforcement
        of ordinance imposing a $20 per ton per year fee on users
        of such equipment having more than a 5-ton capacity, was
        not proper, where there was an absence of proof as to the
        effect, financially or otherwise, on the other alleged members
        of the class (Highland Park Ordinance No 744, § 4.8; Court
        Rule No 16 [1945]).

2. MUNICIPAL CORPORATIONS—WATER CONSERVATION—CONSTITUTION-
    AL LAW.
    The conservation of water is a legitimate objective for the legis-
        lative body of a city, but the exercise of the power to deal
        with such matter is governed by constitutional restrictions,
        including the requirement that there not be arbitrary, unjust,
        and discriminatory action in such respect (US Const, am
        14, § 1; Mich Const 1908, art 2, § 1).

3. SAME—ORDINANCES—CLASSIFICATION.
    Classifications of objects to which a municipal ordinance may be
        made applicable must be based on natural distinguishing
        characteristics and must bear a reasonable relation to the
        object of the ordinance.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 37 Am Jur, Municipal Corporations § 170.
[2, 3, 4] 37 Am Jur, Municipal Corporations §§ 158, 159.
[5, 6] 37 Am Jur, Municipal Corporations § 173.
[7] 3 Am Jur, Appeal and Error § 838.
[8] 14 Am Jur, Costs § 97.

4. SAME — ORDINANCE — WATER CONSERVATION — AIR-CONDITION-
ING EQUIPMENT—EQUAL PROTECTION OF LAW.

>   A city ordinance designed to conserve available water by taxing
>   the usage of nonrecirculating water-cooled air-conditioning
>   equipment over 5-ton capacity at rate of $20 per ton per
>   year, thereby leaving untaxed and unrestricted some 40%
>   of capacity used for such purpose and which tax was designed
>   to be so burdensome as to cause users thereof to convert
>   to other types of air-conditioning equipment and not for
>   revenue purposes *held*, an arbitrary and discriminatory classifi-
>   cation and denial of equal protection of the laws (US Const,
>   am 14, § 1; Mich Const 1908, art 2, § 1; Highland Park Ordi-
>   nance No 744, § 4.8).

5. CONSTITUTIONAL LAW—ORDINANCES.

>   The constitutionality of an ordinance predicated upon the exist-
>   ence of a particular state of facts may be challenged by show-
>   ing to the court that those facts have ceased to exist.

6. MUNICIPAL CORPORATIONS—ORDINANCES—WATER CONSERVATION—
EMERGENCY—CHANGE OF CIRCUMSTANCES.

>   City ordinance which levied a prohibitive fee for the use of
>   nonrecirculating type of water-cooled air-conditioning equip-
>   ment in plaintiffs' theaters but did not even tax 40% of
>   the capacity of such type of equipment used in the city and
>   failed to levy any tax upon other nonrepetitive uses of water
>   and which was adopted at a time when city had shortly there-
>   tofore experienced a shortage of available water *held*, uncon-
>   stitutional after emergency had passed and system had been
>   so supplemented as to be able to meet all foreseeable demands
>   including usage by plaintiffs (Highland Park Ordinance No
>   744, § 4.8).

7. APPEAL AND ERROR—QUESTIONS REVIEWABLE—ORDINANCES—CON-
STITUTIONAL LAW.

>   Determination that ordinance, levying a tax upon some, but not
>   all users of nonrecirculating type of water-cooled air-condition-
>   ing equipment was unconstitutional as to the 2 plaintiff
>   theaters at time of trial, based on then-existing facts because
>   it was a denial of the equal protection of the laws and no
>   longer necessary as a water conservation measure, rendered
>   it unnecessary to determine other constitutional questions raised
>   (US Const, am 14, § 1; Mich Const 1908, art 2, § 1; Highland
>   Park Ordinance No 744, § 4.8).

8. COSTS—FAILURE OF EITHER PARTY TO PREVAIL IN ENTIRETY.
    No costs are allowed upon affirmance of decree holding void a
    water-conservation ordinance as to 2 plaintiff theaters, where
    neither party, on appeals and cross appeals, has prevailed in the
    entirety (Highland Park Ordinance No 744, § 4.8).

Appeal from Wayne; Baum (Victor J.), J.    Submitted June 8, 1960.   (Docket No. 24, Calendar No. 48,324.)   Decided January 9, 1961.

Bill by Palmer Park Theatre Company and Tuxedo Theatre Company, Michigan corporations, against the City of Highland Park, a municipal corporation, and several of its officials, to declare void an ordinance requiring licensing of larger-sized air-conditioning equipment of type which expends water. Cause revised to constitute a class action. Various interested parties, advised of proceedings, were not interpleaded, and relied on class member representation. After opinion rendered but before decree entered, Davidson Bros., Inc., a Michigan corporation, and ACF–Wrigley Stores, Inc., a Delaware corporation, petitioned to be joined as parties plaintiff. Decree entered determining licensing provision of ordinance unconstitutional and invalid as to original plaintiffs only, and dismissing action as to all other parties to class suit. Petitions of Davidson Bros., Inc., and ACF–Wrigley Stores, Inc., for entry of decree in their favor, as members of a class, denied. Petition of The Fashion Shop, Inc., a Michigan corporation, and other merchants and manufacturers for rehearing and amendment of decree to include them as members of a class denied. Plaintiffs and petitioners appeal. Defendants cross-appeal asking reversal of decree with determination of validity of ordinance, affirmance of decree dismissing other parties and affirmance of orders denying other parties' right to participate in a class action. Affirmed.

*David Newman* (*Carroll C. Grigsby*, of counsel), for plaintiff theaters, and for petitioners The Fashion Shop, Inc., and others.

*Irwin I. Cohn* (*John Sklar*, of counsel), for petitioners Davidson Bros., Inc., and ACF–Wrigley Stores, Inc.

*Colin J. McRae*, City Attorney, and *George W. Moore*, Assistant City Attorney (*Hugh G. Allerton*, of counsel), for defendants.

KAVANAGH, J. Palmer Park Theatre Company, Tuxedo Theatre Company, and Allied Theatres of Michigan, Inc., on behalf of themselves and all other similarly situated water rate payers of Highland Park, filed a bill of complaint in the circuit court for the county of Wayne asking the court to declare section 4.8 of ordinance 744 of the city of Highland Park invalid, illegal, and unconstitutional by reason of being in violation of the due process clauses of the State and Federal Constitutions.* They asked the court to enjoin the city from enforcing it. Allied Theatres of Michigan, Inc., was subsequently dropped from the proceedings.

In Highland Park there are some 79 users of air-conditioning equipment of the nonrecirculating type, many of whom had paid under protest the license fee provided by the ordinance. Among these, in addition to plaintiff theaters, are appellants Davidson Bros., Inc., ACF–Wrigley Stores, Inc., The Fashion Shop, Inc., Juliet Wearing Apparel, Inc., Grand Packing, Inc., and Allied Research Products, Inc.

By stipulation of the parties and by the order of the court, the action was made a class action and an appropriate amended bill of complaint was filed

---

* Mich Const 1908, art 2, § 16; US Const, am 14, § 1.—REPORTER.

on behalf of all members of the class. Notice was given to all members of the class by mail and by publication, pursuant to Michigan Court Rule No 16 (1945) and court order. Other members of the class did not intervene individually, but relied upon the representation of the action as constituting a class action and prosecuted for the benefit of all of the class.

The facts necessary to an understanding of the questions of law involved were adequately and fairly set out by the trial judge in his written opinion. We adopt his following statement of facts:

### "1—PROCEEDINGS.

"The plaintiffs seek a determination that section 4.8 of ordinance 744 of the city of Highland Park is illegal and asks the court to enjoin the city from enforcing it. This provision is concerned with the licensing of air-conditioning equipment of the type which does not conserve water. It imposes fees for the use of such equipment. These fees are in addition to the regular charge of water.

"The plaintiffs, Palmer Park Theatre Co. and Tuxedo Theatre Co., seek relief for themselves and for other owners of nonconserving type air-conditioning equipment. The named plaintiffs contend that all spoken for are similarly situated and members of a class to be governed by the outcome of this case.

### "2—THE ORDINANCE.

*"The Pertinent Language.*

"The pertinent provisions of the section under attack are as follows:

" 'Sec. 4.8, Fees for permits, licenses and examinations. The fee for permits, licenses, examinations, et cetera, shall be determined by the council * * * subject to the following minimum and maximum amounts: * * *

" 'Annual operating permits: Effective 1 year following the passage of this ordinance an additional

fee will be charged annually at the rate of $20 per ton on any water-cooled unit or combination of units *exceeding 5 tons capacity* for all systems or equipment not meeting the water conservation requirements contained in section 7.1 of this ordinance * * * ' (Emphasis supplied.)

"Section 7.1 of the ordinance requires air-conditioning equipment to have water conserving features which recirculate or reuse water in cycle after cycle.

*"The administration of the ordinance.*

"In the administration of the ordinance, city officials have only sought to impose the $20 per ton fee upon each user's tonnage of nonconserving type equipment over and above 5 tons of capacity. For example, the user of a 10-ton unit would only be charged $100 annually; $20 a ton for 5 tons. Units of less than 5 tons capacity are exempted entirely.

*"Other provisions of the ordinance.*

"Another portion of the ordinance, which is not under attack, prohibits altogether the future installation of nonconserving equipment of over 5 tons capacity. The quoted provision, which is here assailed by the plaintiffs, levies the permit or license fee against nonconserving equipment which was installed prior to the enactment of ordinance No 744. It should be noted, however, that the effective date of this provision is 1 year after its enactment. This was done to allow time to owners of nonconserving equipment to discontinue its use or to convert to the conserving type and thereby to avoid the $20 per ton levy.

### "3—Facts

*"Conserving versus nonconserving equipment.*

"Air-conditioning equipment which is cooled by water is of 2 types. Conserving type equipment recirculates water over and over again, losing only so much of the water as may evaporate. Nonconserving equipment uses water in only 1 cycle and then discharges it into the drain. Nonconserving equipment may be converted to conserving equipment. One

method is to construct a cooling tower for use with the existing equipment. Water is cooled in the tower after a cycle so that it may be used again. This is the most common method used for conversion. *"How the ordinance affects the plaintiffs.*

"Turning to what the evidence discloses concerning the named plaintiffs, we find that the Palmer Park Theatre Co., installed its present air-conditioning equipment in 1937. At that time, the equipment was perfectly legal. Its use was not subject to any special license fee or charge. Palmer Park Theatre's equipment consists of 2 nonconserving units, one having 15 tons and the other 65 tons of capacity.

"It would cost the theater $1,215 a year to pay the license charge levied by the city's ordinance. It would cost Palmer Park Theatre Co. $10,000 to convert to water conservation by installing a water tower. No other means of conversion appears to be feasible.

"There is grave doubt that the theater can continue in operation if it must comply with the ordinance. It is very unlikely that it could stand a $1,200 addition to its annual operating cost and still come out in the black. There isn't that much profit out of which to pay. It cannot raise sufficient funds to finance conversion to a conserving type system. To stop using air conditioning altogether would severely damage its competitive position during the warm months of the year. Competing theaters using water-conserving or air-cooled equipment are not required by the ordinance to pay any special charge. July and August represent 2 of the best months in the year for motion picture theaters in the city of Detroit. Without air-conditioning, patronage would be greatly diminished or eliminated altogether in one of the best seasons.

"The alternatives of paying a $1,200 annual fee, or converting at a cost of $10,000, or attempting to operate without air conditioning all make it very probable that the ordinance has written an end to

the theater's business life.  In short, if the ordinance
is valid and enforceable, it almost certainly means
that Palmer Park Theatre Company will be forced to
go out of business.

"The position of the Tuxedo Motion Picture Thea-
tre is identical.  It installed its equipment in 1948
when this kind of equipment was entirely legal and
not subject to any special fee or charge.  It cannot
stand an annual license fee of over $525.  As its man-
ager testified: 'There is no profit to pay it from.'
It has no way of paying $10,000 to install water-
recirculating equipment.  Without air conditioning,
it can't compete.

"I believe on the evidence before me that it is
highly likely the ordinance will put these 2 motion
picture theaters out of business.

"As to the 2 named plaintiffs, it is hard to visualize
any legislative action which could have any harsher
results.

*"City's objective in adopting the ordinance.*

"This suggests a question.  Why did Highland
Park adopt such a stringent ordinance?  The city has
been most forthright in answering the question.  It
passed the ordinance to discourage the use of water
in a manner it considered wasteful.  The city did this
at a time when it believed that on very hot summer
days there was a real possibility that it might be
unable to meet the demand of its customers for water
and, at the same time, maintain a safe reserve.

"The city hoped that by saddling nonconserving
air conditioning with a heavy charge, the owners
would be encouraged either to convert to conserving-
type equipment or to discontinue use altogether.

"The charge imposed by the ordinance was pur-
posely designed to be a large and burdensome one to
owners.  To the extent that owners of large scale
nonconserving equipment continued to use it, the
purpose of the statute would be defeated.  The city
was not looking for revenues but for a cessation in
the use of such equipment.  To the extent to which

the ordinance works, it prohibits. To the extent that it fails to prohibit, it has failed in its purpose.

"So effectively has the ordinance carried out its purpose in the case of the 2 theaters, that it amounts to a prohibition on the use of their nonconserving equipment. The ordinance could not more effectively have outlawed the use of their equipment by an outright prohibition.

*"The fee imposed not related to cost of administration.*

"The license fee of $20 per ton per year is imposed by ordinance 744 upon 1,850 tons of air-conditioning equipment in Highland Park. As one might imagine in connection with legislation having a prohibitory purpose, the fees imposed have no relationship whatever to the cost of administering or enforcing the ordinance.

*"Circumstances under which ordinance was enacted.*

"What were the circumstances which prompted the city to adopt ordinance 744?

"The summer of 1955 was an extremely hot summer and the demand for water was extraordinarily heavy. On the day in which demand reached a peak for the year, the Highland Park water system was called upon by customers to deliver 19,470,000 gallons of water. This is an all-time high.

"In the average summer there are only 17 days of heat in excess of 85 degrees. In 1955, there were 59 days in which the temperature hovered around 90 degrees or more.

"The blistering heat of the summer of 1955 affected the city's reserve. The city's raw-water reservoir can hold about 45,000,000 gallons of water, which is roughly a 2 to 2½ days' supply. At times during peak demand in the summer of 1955, there was only a 12-hour reserve in the raw-water reservoir. This was often the case during that long-to-be-remembered summer.

"It is the city's contention in this litigation that the use of water in nonconserving air conditioners

in Highland Park has been a large and wasteful use. The plaintiffs contend that neither is the case.

"Let us consider the question of waste. Nonconserving type equipment runs water through the air-conditioning system only once and then dumps it into the sewer for ultimate return to the water courses of the land. So do automatic dishwashers, garbage appliances and automatic washing machines. Water sprinkled on lawns does its work and evaporates or finds its way into sewers or underground watercourses. Water used manually for bathing, dishwashing and clothes washing likewise goes down the drain into the sewer.

"There are types of air conditioning, however, which don't consume anywhere near as much water for the same cooling effect as does nonconserving equipment. Air-cooled equipment, of course, uses no water. Water-cooled air-conditioning equipment which has water-recirculating features uses about $\frac{1}{10}$ the water of its nonconserving counterpart. One can conclude that the use of water in nonconserving type air conditioners is no more wasteful than its use in dishwashing, bathing, clothes washing, disposing of garbage or lawn sprinklng, and it should be remembered that plaintiffs pay for the use of this water at the same rate as the other consumers. But, nonconserving air conditioning uses much more water to do the same job than its conserving cousin. One may conclude that while nonconserving equipment uses more water than conserving equipment, it is no more wasteful than many other common uses of water. So much for the matter of waste.

"As to the matter of the amount of water consumed, there are about 3,300 tons of nonconserving equipment in Highland Park. The city contends that in the absence of restrictions, on a very hot summer day, the combined nonconserving air-conditioning equipment in Highland Park will use 3,000,000 gallons of water. The plaintiffs contend that on such a day, the total amounts to only 1,800,000 gallons at most.

"I find the plaintiffs' testimony, offered through John A. Fulkman, the more convincing.

*"Description of the water system.*

"Construction of the present Highland Park water system was started in 1914 and completed in 1918. It underwent no substantial expansion or change from its beginning through the summer of 1955. It remained for that record-breaking summer to reveal the weaknesses in the system. A brief description of the system appears to be in order. Highland Park's source of raw water is Lake St. Clair. At a point which is within the municipality of Grosse Pointe Farms, the city of Highland Park owns and maintains, jointly with the former, an intake pipe and pumping station. At this point, raw water is taken from the lake and started on its way. Transmission pipes carry the water some 11.3 miles to the reservoir and plant located at Davison and Dequindre in the city of Detroit.

"About midway between this plant and the source at Lake St. Clair, there is presently a booster station where pumps create pressure to speed the flow of raw water. The booster station was not yet in existence during the summer of 1955. At the plant at Davison and Dequindre, there is a filtration system for purifying the raw water. When the raw water is rendered potable, it may be stored in a clear water well or pumped into transmission pipes leading to consumers. Pure water is ultimately pumped through the pipes which carry it to the water outlets of consumers.

*"Contractual arrangements with other cities.*

"The city of Highland Park has a contractual arrangement with the city of Detroit for taking water from the latter. Pursuant to this contract, Highland Park has availed itself of Detroit water at times when demand for its water persisted at peak levels for extraordinarily long periods. During the freakishly hot summer of 1955, the city of Highland Park took about 48,000,000 gallons of water from the city of Detroit. Highland Park can produce its own water

for substantially less than the price it must pay to Detroit, but it probably doesn't lose any money in the sale of Detroit water.

"In taking Detroit water, the city of Highland Park is hedged about by certain restrictions provided in the contract. For example, it cannot take water during hours of peak demand, but only during 'off-peak' hours. Either by contract, custom, or comity between the 2 cities, Highland Park cannot take Detroit water at times of high seasonal demand unless it is following much the same conservation practices as Detroit. During the summer when Detroit had a lawn sprinkling ban on alternate days, the Highland Park water department adopted a similar regulation. This restriction was never embodied in an ordinance and the water department regulation was not regarded as having the force of law and was not enforced. There was little or no observance of the regulation by residents.

"The contract with Detroit permits Highland Park, in an emergency such as fire, to take Detroit water rather freely and without abiding by restrictions otherwise applicable.

"Another contract has some bearing. It is a contract between Highland Park and Grosse Pointe Farms concerning the intake of water from Lake St. Clair. This agreement restricts Highland Park to the taking of a maximum of 20,000,000 gallons of water in any 1-day period.

"Twenty million gallons a day is somewhat in excess of the all-time high consumption in 1955 of 19,-470,000. One may wonder, therefore, why Highland Park suffered the depletion it did in the supply of raw water in its reservoir, especially in view of the fact that this reservoir can be filled during days when demand for water is low and replenished as necessary in 'off-peak' hours.

*"Reasons for the shortage in 1955.*

"The trouble in 1955 was that neither the intake pumps, transmission pipes, nor the filtration system could be counted on to produce at a daily rate of

20,000,000 gallons. The system couldn't handle the maximum allowed at the source by the Grosse Pointe Farms contract. And, to deliver about 19,500,000 gallons to consumers in a single day and still keep the raw water reservoir filled, all parts of the system would have to render balanced production at a daily rate of about 19,500,000 gallons.

"But the fact was that during the summer of 1955 the transmission pipes from Grosse Pointe Farms to the water plant at Dequindre could only carry a maximum of 16,500,000 gallons a day. Moreover, the filtration plant could not be counted on for continuous production at a daily rate of 19,500,000 gallons during that summer.

"Due to the inability of Highland Park to put enough water through the mains from Lake St. Clair to the water plant, the raw-water reservoir contained only a half day's supply through a substantial part of the summer of 1955. This was regarded by those in charge of the water system as being inadequate. In the event of a breakdown of the intake or transmission system, there would have been serious problems in meeting demand without wholesale use of Detroit water.

"*Municipal action to correct imbalance between supply and demand.*

"After the uneasy summer of 1955, the leaders of the city government in Highland Park were determined that something had to be done before the summer of 1956. There were 2 general ways to alleviate the situation: Increase supply and curtail demand.

"The city started down both paths. We are familiar with the legislative attempt to reduce demand by discouraging the use of nonconserving type air conditioning. The city also embarked upon a program of increasing the supply of water to the raw-water reservoir, which will be discussed later.

"Faced with the problem of bringing demand into better balance with supply, the city made no serious attempt to restrict lawn sprinkling, although lawn sprinkling in Highland Park consumed about 5 to 5½

million gallons of water a day on hot, dry summer days. A limitation on lawn sprinkling to off-peak hours or a ban on certain days would have inconvenienced residents of the city but would not have imposed any financial burden on them. Ordinance 744, on the other hand, visited upon the named plaintiffs a very real economic burden.

*"Improvements in the water system accomplished after 1955.*

"On the supply front, the city moved forward by cleaning and removing tubercles from transmission mains. Tubercles are barnacle-like growths which tend to reduce the capacity of pipes to carry water. A 'booster' pumping station was constructed and put in operation sometime in 1957 at a point midway between the source of water at Lake St. Clair and the filtration plant. This improvement speeds the transmission of water from the source to the place where it is stored and filtered and increases pressure in the system. These works raised the capacity of the transmission mains from Lake St. Clair from 16,500,-000 gallons per day, their capacity in 1955, to around 19,500,000 gallons or more.

"After 1955, the installation of a new purifying system was undertaken which greatly improved facilities for storage, purification and distribution of both raw and finished water. The new system utilizes devices known as clarifiers. In addition, after 1955, the city started on a program for construction of larger water mains for the transmission of completed water to consumers. For much the same purpose, new transformers were installed in the pump house at the Dequindre plant. All this work was undertaken after the distressing summer of 1955.

*"Present capacity of the water system.*

"Both the city and the plaintiffs agree that with all of these improvements, the present water system of Highland Park could comfortably supply a demand equal to the all-time high of nearly 19,500,000 gallons a day.

"Witnesses for the city testified, and I agree, that the system is presently well balanced, both internally and with respect to maximum potential demand. It is clear from the testimony of the city's witness, Vernon L. Hinebrook, that the improvements installed since 1955 would have 'taken care of the emergency' had they been present during that scorching summer.

"The defendants' witnesses took pride in the fact that the system can now turn out finished water in a peak hour at a rate of over 24,000,000 gallons per day. Upon completion of the improvements which are underway, the city will be able to maintain pumpage at peak hours at a rate of 26,000,000 gallons a day for an hour or two at a time.

"The plaintiffs' expert witness contended that the city has even greater capacity than this. Under the evidence before me, it seems probable that the city could presently supply 21,000,000 to 23,000,000 gallons a day with ease for a few days at a time, using the raw-water reservoir to supplement the direct intake from Lake St. Clair.

"The National Fire Underwriters Group are interested in municipal water systems. They are concerned regarding the sufficiency in amount and quality of pure water which can be delivered to the site of a fire and the pressure at which the water can be discharged. Their opinion of a city's system is reflected in insurance premium rates which the Underwriters set or greatly influence. At all pertinent times, the city of Highland Park has enjoyed a good rating by the Fire Underwriters, although in 1954 this group recommended certain changes to the city.

"The Underwriters Group appear to be perfectly satisfied with the present state of the Highland Park water system. *I am of the opinion that even with nonconserving equipment going full blast on a hot summer day, the Highland Park water system is adequate to cope with any outbreak of fire.* (Emphasis supplied.)

"The population of the city of Highland Park has been declining. Even so, this trend has not been accompanied by a definite downward trend in the demand for water. Nevertheless, witnesses for the city were satisfied that the present system could adequately take care of all demand for water in the foreseeable future. With this, the plaintiffs agreed. So does the court.

"I am of the opinion that the present system, improved as it has been since 1955, is adequate to handle all potential demand with ease, including unregulated and unrestricted demand for water by present users of nonconserving air-conditioning equipment. I am also of the opinion that the system is adequate to cope with any conflagration even if the outbreak were to occur during a hot summer day at a time when nonconserving air conditioners were in operation unrestricted by ordinance 744 or any comparable regulation. It should be remembered at this point that the ordinance, by a presumably valid provision not here in question, prohibits new installations of nonconserving air-conditioning equipment having capacity in excess of 5 tons per unit. My conclusion respecting the adequacy of the present system to meet any potential demand in the future would be the same whether nonconserving equipment uses 3,000,000 or only 1,800,000 gallons of water on very hot summer days, since the system now has a very high capacity for 1 to 3 hours of peak operation."

Several questions are raised on the appeal as framed by both appellants and appellees. These, we think, may be condensed into 2 basic questions:

(1) Did the trial judge err in dismissing said cause as a class suit and dropping as parties plaintiff* all members of the alleged class except the 2 plaintiff theaters?

(2) Is section 4.8 of ordinance No 744 of the city of Highland Park unconstitutional and invalid be-

---

* See CL 1948, § 612.13 (Stat Ann § 27.665).—REPORTER.

cause of unreasonable, arbitrary, and discriminatory classification and operation?

At the conclusion of the trial, the court held that this was not a proper class action, on the theory that the members were not similarly situated. There was an absence of proof as to the effect, financially or otherwise, on the other alleged members of the class. The trial court in his opinion said:

"The application of the ordinance imposes an uneven burden. To some of the putative members of the class, the cost of conversion to water-circulating equipment might be so slight, taking into account the size of their air-conditioning plants and the magnitude of their business operations, as to be minimal. To others, the cost of conversion might well be prohibitive. Apart from the 2 theaters, I simply can't tell from the evidence which persons may be merely annoyed by the ordinance and which may be effectively prohibited from using their equipment or even prevented from continuing in business altogether.

"The evidence discloses that Highland Park Floor Covering Co. completely discontinued the use of its nonconserving equipment and carried on in business without the benefit of air conditioning. To one business, the outlawing of its air-conditioning equipment may be a slight inconvenience. To another, such prohibition may, for all practical purposes, destroy its ability to carry on. The floor covering company appears to be in the first category; the 2 theaters in the second category. The 2 cases seem quite different. Presumably the floor-covering concern quit using air conditioning to avoid paying the annual levy of $20 per ton, but could operate profitably nevertheless. To the 2 motion picture theaters, air conditioning is indispensable for summer showings, and summer showings are essential to profitable operation.

"The manner in which an ordinance applies is important in any consideration of its validity. The relative hardship imposed is often a material factor.

The hardship imposed must be reasonable, considering the necessities of the case, if the statute is to be sustained.  * * *

"The uneven application of the same statute to various persons may render it reasonable and valid in one case, but unreasonable and unconstitutional in another."

Justice CARR, writing for the Court in *Bajorek* v. *Kurtz,* 335 Mich 58, in an action brought by a number of lot owners in a particular subdivision for damages against a cement and concrete products manufacturer whose heavy trucks, in delivering cement and other materials, caused vibrations of the earth and cement dust, all of which interfered with the use and enjoyment of their property by the respective residents, said (pp 63, 64):

"Each of the plaintiffs is asserting the right to recover damages from the defendants because of alleged improper conduct on their part.  Reference to the bill of particulars filed indicates that some plaintiffs are seeking to recover for items of damage not asserted by other plaintiffs.  Clearly the plaintiffs are not seeking the same relief, but each is interested solely in the recovery of damages to him and his property that he asserts have resulted proximately from the acts charged against the defendants.  * * *

"We have a situation presented in which a number of persons assert that they have been injured severally in their property rights because of improper and unlawful acts on the part of defendants.  It cannot be said with certainty that the same issues will be presented in all of the 25 cases alleged in the declaration and covered by the bill of particulars.  Proofs may show damage in some cases but not in others, and defenses may exist against the rights of certain plaintiffs that are not available against other plaintiffs.

"We do not think that it was the intention of the legislature in the enactment of the provisions of the

statute relating to joinder of causes of action to permit such method of procedure in a situation of the character here involved."

Although Justice CARR was there speaking with reference to the statute* rather than the present Court Rule, *supra,* the same rule of law would apply.

The trial court in the instant case had before it separate rather than joint actions and would have needed proofs with particular reference to the effects the ordinance would have upon each of the members of the class. No such proofs were offered. Therefore, he correctly decided this was an improper class action.

The constitutional question presents a much more complicated and difficult problem. Plaintiffs contend the ordinance is unconstitutional and invalid for the following reasons:

(1) The city imposed punitive and exorbitant annual license fees upon the use of previously (and validly) installed water-using air-conditioning and refrigerating equipment for the sole purpose of coercing plaintiffs either into a discontinuance of facilities or a costly installation of water-recirculating facilities.

(2) The city cannot relieve itself of the duty to provide service by penalizing one segment of the users by burdening them with excessive fees in order to evade the municipal obligation to provide adequate water to all its inhabitants.

(3) The city, under the guise of its police power, cannot shift the burden of public improvements to a limited group of private users.

(4) The ordinance is arbitrary and discriminatory both in classification and in operation.

(5) Substantial prohibition of water-using non-recirculating air-conditioning equipment by the de-

---

* CL 1948, § 608.1 (Stat Ann § 27.591).

vice of excessive licensing fees amounts to taking plaintiffs' property without just compensation and without due process of law.

(6) The need, propriety, and validity of the ordinance is to be tested by existing conditions and not by the temporary circumstances of 1955 prior to the city's repairing and augmenting its water distribution facilities.

(7) The city may not impose punitive and excessive license fees upon use of intrinsically innocent and lawful equipment where the fees prescribed bear no reasonable relationship to the cost, supervision, and regulation thereof.

We do not feel we need discuss all these questions. We shall discuss only 2 of them.

The first question is: Is the ordinance arbitrary and discriminatory and, therefore, unconstitutional by reason of failing to treat all within the class equally?

The legislation in this instance was aimed at water conservation, a perfectly legitimate objective for the legislative body. Following the drought situation in 1955, the legislative body was confronted with a very perplexing problem. It had not only a right but a duty to deal with the problem, but its power was not unlimited. This power was governed by constitutional restrictions, including the equal protection of the law provisions of the State and Federal constitutions.* The actions could not be arbitrary, unjust and discriminatory with reference to the classification to which the penalty provisions of the ordinance were to apply.

Let us consider the facts as they existed. At the time of trial, of the total 3,000 tons of water-cooled nonrecirculating air-conditioning equipment in Highland Park, 1,200 tons—40%—was within the untaxed

---

* Mich Const 1908, art 2, § 1; US Const, am 14.—REPORTER.

and unrestricted category of less than 5 tons. Admittedly, ton for ton, the smaller units consumed just as much water as the larger units. The ordinance thus applied its punitive features to only a part of the users of water-cooled nonrecirculating equipment, while permitting a substantial portion of that group or class of users of nonrecirculating air-conditioning equipment to be free from the penalties of the ordinance.

We are not discussing here or deciding whether there ought to be included in this class a myriad of other water-consuming and nonconserving equipment (swimming pools, dishwashers, laundry machines, et cetera) neither are we making reference to the fact that lawn sprinkling alone in Highland Park consumes double the water used by the air-conditioning equipment here in question, nor that it operates without bearing a similar burden to that imposed by this ordinance. Parenthetically, it might be pointed out that shifting of lawn sprinkling periods or the elimination of lawn sprinkling would impose no great, irreparable injury or pecuniary damage.

This Court, speaking of the equal protection of the laws provisions of the State and Federal constitutions, stated in *Cook Coffee Co.* v. *Village of Flushing*, 267 Mich 131, 134:

"These constitutional provisions do not mean that there can be no classification in the application of statutes and ordinances, *but only that the classification must be based on natural distinguishing characteristics and must bear a reasonable relation to the object of the legislation.*" (Emphasis supplied.)

In *Peninsular Stove Co.* v. *Burton,* 220 Mich 284, this Court held invalid as class legislation a statute regulating the installation of warm-air heating plants enclosed in galvanized sheet iron. The Court pointed out (p 287):

"We have, therefore, not only the selection of a class of heating plant *but of a class of this class.* To justify such action it must appear that some substantial reason existed for the regulation of this particular kind of heating plant not equally applicable to the others." (Emphasis supplied.)

As to this classification within a classification, the Court concluded (p 288):

"It seems clear to us that the classification here made is not based upon any real or substantial distinction."

The general rule is stated in *Mulloy* v. *Wayne County Board of Supervisors,* 246 Mich 632, 638, where this Court quoted with approval the following language:

" 'The classification must be based upon substantial and real differences in the classes, *which are germane to the purpose of the law and reasonably suggest the propriety of substantially different legislation,* the legislation must apply to each member of the class, and the classification must not be based on existing circumstances only, but must be so framed as to include in the class additional members as fast as they acquire the characteristics of the class.' *Bingham* v. *Board of Supervisors,* 127 Wis 344 (106 NW 1071)." (Emphasis supplied.)

In *Haynes* v. *Lapeer Circuit Judge,* 201 Mich 138, 141, 142 (LRA1918D, 233), this Court said:

"It is elementary that legislation which, in carrying out a public purpose for the common good, is limited by reasonable and justifiable differentiation to a distinct type or class of persons is not for that reason unconstitutional because class legislation, if germane to the object of the enactment and made uniform in its operation upon all persons of the class to which it naturally applies; *but if it fails to include and affect alike all persons of the same class, and extends immunities or privileges to one portion and*

*denies them to others of like kind,* by unreasonable or arbitrary subclassification, it comes within the constitutional prohibition against class legislation." (Emphasis supplied.)

The attempt to regulate a portion of the class under the ordinance in the instant case constitutes an arbitrary and discriminatory classification and denies the equal protection of the laws.

The second question we shall discuss is: By what standard do we test the propriety of the legislative objective—should it be by what was reasonable in the spring of 1956 or what was reasonable at the time of trial?

In *United States* v. *Carolene Products Co.,* 304 US 144 (58 S Ct 778, 82 L ed 1234), the United States supreme court said (p 153):

"The constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist."

In *Chastleton Corp.* v. *Sinclair,* 264 US 543 (44 S Ct 405, 68 L ed 841), Justice Holmes, writing for the court, said (pp 547, 548):

"A law depending upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change even though valid when passed."

The trial court found as a matter of fact that there was a great change in the situation between the summer of 1955 and the trial of this lawsuit. A reading of the record brings us to the same conclusion. The water system of the city of Highland Park in 1955 could meet maximum demand only with strain and reliance on another city's water. At the time of trial all agreed that by reason of the additions and improvements, together with certain repairs, the sys-

tem could with ease meet all foreseeable demands, including that of existing users of nonrecirculating air-conditioning equipment. Under the circumstances it is not reasonable to exact a prohibitive fee from some members of a class and not from others. Such users of water who bathe, wash dishes or clothes, or sprinkle their lawns, including individuals who have less than 5 tons of nonrecirculating air-conditioning equipment, are exempt from the fee. It is to be remembered that those with a system of over 5 tons pay the same price for water used as do all other exempt users.

In view of the passing of the emergency and the change of circumstances with respect to the system, the trial court reached the correct conclusion in holding the ordinance was unreasonable and arbitrary. Since we hold, for the above reasons, that the ordinance was unconstitutional as applied to the 2 plaintiff theaters at the time of trial, based on the then-existing facts, it is not necessary to discuss the other constitutional questions raised.

The opinion of the lower court is affirmed. Since neither party has prevailed in the entirety, no costs are allowed.

DETHMERS, C. J., and CARR, KELLY, and BLACK, JJ., concurred with KAVANAGH, J.

EDWARDS, J. (*concurring*). Under the facts in this case as outlined in the findings of the circuit judge and the opinion of Justice KAVANAGH, I believe that we should affirm the holding of the chancellor below:

"The disputed legislation goes far beyond the necessities of the case and deprives the plaintiff theaters of liberty and property without due process of law."

Thus, I concur in the result reached by Mr. Justice KAVANAGH and the reasons given therefor, except

for that portion of his opinion which plants decision upon the ground of arbitrary and unconstitutional classification. The facts as established in this case appear to me to warrant the conclusion that the air-conditioning equipment of plaintiff theaters required such an extraordinarily large water usage as to support a legislative classification based thereon.

SMITH and SOURIS, JJ., concurred with EDWARDS, J.