IROQUOIS PROPERTIES v CITY OF EAST LANSING

Docket No. 86497. Submitted December 3, 1986, at Lansing. Decided
    June 2, 1987. Leave to appeal applied for.

    Iroquois Properties, doing business as Cedar Greens, and other
    owners of residential property with more than two units who
    pay, have paid, or are required to pay a charge for the collec-
    tion of rubbish filed a class action lawsuit against the City of
    East Lansing in Ingham Circuit Court challenging the constitu-
    tionality of the city's rubbish collection ordinance, claiming
    that the ordinance violated the equal protection clauses of the
    Michigan and United States Constitutions. The court, James T.
    Kallman, J., found the refuse collection fee exacted by the
    ordinance to be unconstitutional and ordered the city to return
    all fees collected pursuant to the ordinance. Defendant ap-
    pealed.

    The Court of Appeals *held:*

    1. The trial court erred in concluding that the rubbish
    collection ordinance of defendant city violated the equal protec-
    tion clauses where multifamily dwellings were assessed a fee
    for dumpster collection, but single and two-family dwellings
    using the city's curbside collection service were charged no fee.

    2. The trial court also erred by concluding that defendant
    city's rubbish collection fee was an unconstitutional tax.

    3. Since it was error to hold the ordinance unconstitutional,
    it was also error for the trial court to hold that defendant city
    was required to return all fees collected from all affected
    properties.

    Reversed.

REFERENCES

Am Jur 2d, Constitutional Law §§ 735 *et seq.*
Am Jur 2d, Municipal Corporations §§ 455 *et seq.*
Am Jur 2d, State and Local Taxation § 11.
Supreme Court's view as to applicability, to conduct of private
    person or entity, of equal protection and due process clauses of
    the Fourteenth Amendment. 42 L Ed2d 922.
Discrimination in provision of municipal services or facilities as
    civil rights violation. 51 ALR3d 950.

1. CONSTITUTIONAL LAW — STATUTES — EQUAL PROTECTION — CLASSI-
   FICATION.

   There are two tests to guide judicial scrutiny of suspect legisla-
   tive enactments to determine whether or not a particular
   enactment violates equal protection for want of proper classifi-
   cation of subject individuals or entities: (1) Are the enactment's
   classifications based on natural distinguishing characteristics
   and do they bear a reasonable relationship to the object of the
   legislation?; and (2) Are all persons of the same class included
   and affected alike or are immunities or privileges extended to
   an arbitrary or unreasonable class while denied to others of
   like kind?

2. CONSTITUTIONAL LAW — EQUAL PROTECTION.

   An equal protection analysis, particularly where there is no
   suggestion of a suspect classification such as race, begins with
   the principles that the burden is on the person challenging the
   classification to show that it is without reasonable justification
   and that statutes are cloaked with a presumption of constitu-
   tional validity; a statute will be upheld against an equal
   protection challenge if it contains a classification rationally
   related to a legitimate governmental interest.

3. MUNICIPAL CORPORATIONS — REFUSE COLLECTION — ACCESSIBILITY
   OF PROPERTY.

   A property's accessibility to curbside collection is a valid factor
   that a municipality may consider in its decision to offer refuse
   collection.

4. CONSTITUTIONAL LAW — EQUAL PROTECTION — MUNICIPAL CORPO-
   RATIONS — MUNICIPAL SERVICES — FEE RATES — PROPERTY
   TAXES.

   The equal protection clauses of the United States and Michigan
   Constitutions do not prevent the use of property tax figures to
   set fee rates for municipal services; use of property tax figures
   is rationally related to the legislative goal of more equitably
   allocating the costs of those services (US Const, Am XIV; Const
   1963, art 1, §§ 2, 17).

5. MUNICIPAL CORPORATIONS — REGULATORY FEES — TAXATION.

   A regulatory fee, in order to pass judicial scrutiny, must not
   produce revenue in excess of the cost of the regulation; where
   the revenue produced does exceed the cost of the regulation,
   the fee may be construed as an illegal tax.

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by

*William C. Whitbeck* and *John B. Curcio*), for plaintiffs.

*McGinty, Brown, Jakubiak, Frankland & Hitch, P.C.* (by *Thomas M. Hitch* and *Dennis E. McGinty*), for defendant.

Before: BEASLEY, P.J., and R. B. BURNS and G. D. LOSTRACCO,* JJ.

BEASLEY, P.J. Defendant, City of East Lansing, appeals a judgment of the Ingham Circuit Court in favor of plaintiffs, Iroquois Properties, a Michigan limited partnership doing business as Cedar Greens, Ville Monte Limited Partnership, a Michigan limited partnership, and 731 Limited Partnership, a Michigan limited partnership.

In this case, plaintiffs attacked the constitutionality of defendant city's rubbish collection ordinance (ordinance 470), claiming that the ordinance violated the equal protection clauses of the Michigan and United States Constitutions.[1] The trial court certified this matter as a true class action and defined the classes as those owners of residential property with more than two units who pay, have paid or are required to pay a charge for the collection of rubbish. On July 17, 1985, Ingham Circuit Judge James T. Kallman filed a written opinion holding the refuse collection fee exacted by the ordinance to be unconstitutional and ordered the city to return all fees collected pursuant to the ordinance.

Prior to 1979, defendant city provided refuse collection services to single family residences, multifamily residences and to commercial businesses

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] US Const, Am XIV, § 1; Const 1963, art 1, §§ 2, 17.

without any specific user charge. Refuse collection was, at that time, financed out of the city's general fund. While a few property owners, for reasons of their own, used private haulers, nearly all multifamily dwelling owners and commercial businesses used the city's refuse collection service until ordinance 470 was adopted. Under the various city rules and administrative practices then in existence, single and two-family residences and some multifamily dwellings were allowed to use trash cans or bags, which were collected curbside once a week. Larger businesses and multifamily residences were, with few exceptions, required to use dumpsters, although one of the original named plaintiffs (Ville Monte) used trash bags collected at curbside by hand.

In 1975, in response to the increasing costs of refuse collection and changing landfill practices, the city undertook a comprehensive evaluation of its refuse collection system. Besides making observations and recommendations on ways in which the city's rubbish collection system could be improved, the "Solid Waste Collection and Disposal Study" separately analyzed the cost of *residential* rubbish collection, which was composed of primarily single and two-family dwellings, and *commercial,* i.e., dumpster, rubbish collection, which was composed of primarily multifamily residences, and business and tax-exempt properties. According to the study, the cost per ton for residential rubbish collection ($19.68 per ton) was slightly greater than the cost per ton for dumpster collection ($15.84 per ton). In addition, the study concluded that dumpster users were receiving much more in the way of rubbish collection service than they were contributing in property taxes. The study suggested that residential users (single and two-family residence owners) were partially subsidizing

the garbage collection service received by dumpster users.

A following study by the city in 1978 indicated that the patterns revealed in 1975 were more accentuated. According to the 1978 study, the cost of dumpster collection consumed a larger share of the total cost of refuse collection (50 percent in 1975 compared to 56 percent in 1978), while the dumpster user portion of the property tax base had declined from 33.4 percent in 1975 to 31.03 percent in 1978. An updated study in 1979 indicated the trend was continuing: the cost of dumpster rubbish collection constituted 55 percent of the total cost of rubbish collection, while the dumpster users' share of the property tax base declined to 30.07 percent. The total cost of the city refuse collection system in 1979 ($506,500) indicated a substantial increase from the same figure in 1975 ($259,817).

In light of these and other studies, the city considered three options:

(1) Termination of dumpster rubbish collection. (A study revealed that this would save the city $252,000 annually, but would cost dumpster users $442,463 in estimated fees to private haulers.)

(2) Charging a fee for dumpster collection. (City officials calculated that a fee generating $150,000 in revenue from dumpster users would result in a fairly equitable allocation of the costs of refuse collection between residential curbside users and dumpster users.)

(3) A 0.8 increase in the millage rate.

In June, 1979, the city decided to pursue the second option and, thus, passed ordinance 470, which made a number of important changes in the city's refuse collection system.

First, the ordinance codified the city's rules and

administrative procedures concerning refuse containers. Single family and two-family dwellings were required to use portable containers (i.e., trash cans) of not less than twenty nor more than thirty gallons capacity, or heavy-duty trash bags. If the city determined, from the number of trash cans or bags used, that the amount of refuse generated by a property owner exceeded the equivalent of two cubic yards of refuse per week, the city was permitted to require the use of a dumpster or to require collection more than once a week. Multiple-family residences (structures containing more than two dwelling units) were required to use dumpsters with a capacity of not less than three cubic yards.

Second, two types of multifamily residences were exempted from the dumpster requirement:

(a) condominiums and cooperatives constructed as detached single or two-family dwelling units with accessible curbside collection points, and

(b) multiple-family residences where the responsible party demonstrated that a multiple dwelling generated less than an average of two cubic yards of rubbish per week. This exception could be granted only where readily accessible curbside collection points were available and no special sanitation or site location problems existed. An appeal process was made available to owners of multiple dwellings denied a special exemption.

Third, the ordinance levied a fee on dwellings which fell into any of the following categories: dumpster users, premises generating an average of two cubic yards or more per week, and premises requiring curbside collection of portable containers more than once per week. A rate schedule was established based on the size of the container used and the frequency of collection. Not coincidentally, the rate structure adopted was the same one rec-

ommended by the city's financial people as a means to raise $150,000 from dumpster users and, thus, establish an equitable allocation of the cost of refuse collection between dumpster users and the users of the city's residential curbside collection service.

After the ordinance was passed, city officials developed a master list of all potential users of the city's dumpster service. Approximately nineteen multiple-family residences were automatically exempted from the fee requirement because the city engineer determined that those properties would not generate two cubic yards of garbage per week and were readily accessible to curbside collection. Upon application to the city, twenty-six more properties (possibly not all multifamily dwellings) were granted administrative exemptions, generally because the properties did not generate more than two cubic yards of rubbish per week. At least four more multifamily dwelling owners successfully appealed the denial of an exemption and were allowed to use curbside service. Another multifamily dwelling owner was granted a partial exemption, and five multifamily dwellings were allowed to combine with and use a neighbor's dumpster and thereby avoid the fee.

In addition, after receiving notice of the new fee, a number of multifamily dwelling owners chose to discontinue city service and rely instead on private haulers. Thirty-one multifamily dwellings have now opted out of city service. This group includes all of the original named plaintiffs and almost all of the large apartment complexes in East Lansing. Nearly one-half of all multifamily dwelling units in East Lansing are now served by private haulers. According to defendant, the remaining multifamily structures electing to use city service number approximately 111 and consist almost exclusively

of small projects using only one dumpster, with the one large exception being one government subsidized housing structure.

On June 22, 1979, plaintiffs brought suit, alleging that ordinance 470 was unconstitutional on equal protection grounds and was a disguised tax which had been improperly levied. On November 13, 1979, plaintiffs sought certification of this matter as a class action. On March 8, 1982, the trial court ruled that all of the requirements of a true class action had been met and, on October 11, 1983, an order to that effect was entered. This order defined the class as the owners of residential property of more than two units who have paid, are presently paying or are required to pay a charge for rubbish collection pursuant to ordinance 470. Defendant city has not appealed the order certifying the class.

The case was presented to the trial court on a stipulated record. In particular, it was stipulated that only the liability issue would be heard at trial and, if the trial court ruled in plaintiffs' favor, damages would be measured in a subsequent proceeding, possibly involving the appointment of a special master.

On July 17, 1985, the trial court filed a written opinion in favor of plaintiffs. The trial court observed the parties' stipulation as follows:

> Refuse collection service, through the dumpster method of collection generally is more efficient and cheaper on a unitized basis of measurement than refuse collection service through the curbside method of collection.

However, the trial court also noted:

> Yet, if one considers a comparison of the real

property taxes paid by multiple-unit property owners, with the cost of the refuse collection service rendered to each group, it is clear that the single family property owner gets less service per tax dollar spent, and that the refuse collection service for multiple-unit property owners is subsidized by the single-unit property owners' tax dollars.

The trial court framed the issue of the case as whether a city could enact a garbage collection fee schedule based on a comparison of the cost of the service with the relative property tax contributions of its users. The trial court found such action to be unconstitutional, saying that "a city is not obligated to provide refuse collection service," but if it chooses to provide such a service, it must do so in a "non-discriminatory fashion." The trial court also found that, since the fees bore "no reasonable relationship to the expense for which they are chargeable," they had to be construed as a tax, "an unlawful, unconstitutional revenue raising measure by which the City attempted to equalize property taxes of single and multi-unit property owners."

The trial court then ordered defendant city to return all fees it had collected from the affected properties. Defendant appeals as a matter of right the decision of the trial court on both the issue of its liability and the damages owed, raising three issues.

First, defendant says that the trial court erred in concluding that its rubbish collection ordinance violated the equal protection clause where multifamily dwellings were assessed a fee for dumpster collection, but single and two-family residences using the city's curbside collection service were charged no fee.

In the 1974 case of *Alexander v Detroit*,[2] the Michigan Supreme Court considered constitutional equal protection challenges to legislative enactments and addressed the constitutionality of an amendment to Detroit's rubbish collection ordinance. That amendment reclassified waste produced by "multiple dwellings of more than four units" as "commercial waste." Under the commercial waste category, those multiple-dwelling units producing waste in excess of twenty bushels per month were required to pay a fee for refuse collection. Condominiums and cooperatives were specifically exempted from the fee-paying "commercial waste" category and residential dwellings with less than four units continued to receive refuse collection service without charge. The Court indicated two tests for scrutinizing legislative enactments for violations of equal protection:

> (1) Are the enactment's classifications based on natural distinguishing characteristics and do they bear a reasonable relationship to the object of the legislation? *Fox v Employment Security Commission*, 379 Mich 579, 588; 153 NW2d 644, 647 (1967); *Beauty Built Construction Corp v City of Warren*, 375 Mich 229, 235; 134 NW2d 214, 218 (1965); *Palmer Park Theatre Co v Highland Park*, 362 Mich 326, 346; 106 NW2d 845, 855-856 (1961).
>
> (2) Are all persons of the same class included and affected alike or are immunities or privileges extended to an arbitrary or unreasonable class while denied to others of like kind? *Fox v Employment Security Commission*, 379 Mich 579, 589; 153 NW2d 644, 647-648 (1967); *Beauty Built Construction Co v City of Warren*, 375 Mich 229, 236; 134 NW2d 214, 218 (1965); *Palmer Park Theatre Co v Highland Park*, 362 Mich 326, 347-348; 106 NW2d 845, 855-856 (1961).[3]

---

[2] 392 Mich 30, 34; 219 NW2d 41 (1974).

[3] *Id.* at 35-36.

More recently, in *Rouge Parkway Associates v City of Wayne,*[4] the Supreme Court summarized the burden on plaintiffs seeking to challenge legislative enactments based on equal protection, saying:

> An equal protection analysis, particularly where there is no suggestion of a suspect classification such as race, begins with the principle that the "burden is on the person challenging the classification to show that it is without reasonable justification," *Manistee Bank & Trust Co v McGowan,* 394 Mich 655, 668; 232 NW2d 636 (1975), and "[s]tatutes are cloaked with a presumption of constitutional validity." *Id., p 667.* A statute will be upheld against an equal protection challenge if it contains a classification rationally related to a legitimate governmental interest. *Shavers v Attorney General,* 402 Mich 554, 613; 267 NW2d 72 (1978).

Before examining whether the classifications made in the city's rubbish collection ordinance are based on "natural distinguishing characteristics" and "bear a reasonable relationship to the object of the legislation," it is necessary first to clarify exactly what classifications are made under ordinance 470. On its face, ordinance 470 does not require all multiple-family dwellings to pay a fee for rubbish collection, nor does it prevent the imposition of such a fee on single-family or two-family dwellings. As previously noted, a significant number of multiple-family dwellings were exempted from the fee either because they did not generate more than two cubic yards of garbage and readily accessible curbside collection was feasible for them or because they were allowed to combine with and use a neighbor's dumpster and thereby avoid the fee. Nevertheless, in the trial court the parties stipulated to the following fact:

---

[4] 423 Mich 411, 421-422; 377 NW2d 748 (1985).

14. In the City of East Lansing, all single family and duplex residential properties in fact receive curbside refuse collection without the imposition of a special charge and the only residential properties which are required to pay a special charge for refuse collection pursuant to Ordinance 470 are multiple family properties which are required to use dumpsters and do receive dumpster collection from the City.

Thus, while as among the city's residential properties ordinance 470 does not, on its face, lay the burden of the refuse collection fee solely on multiple-family dwellings, plaintiffs can fairly say that such is the result of the ordinance, despite the fact that it assesses its fee based solely on such "natural distinguishing characteristics" as the volume of rubbish generated and the accessibility of the property to curbside collection. It should not have been any surprise to the city that the burden of the fee came to rest on exactly the class of property owners the city hoped it would.

In the within case, even though the city's rubbish collection ordinance is based on the "natural distinguishing characteristics" of volume of rubbish generated and accessibility to curbside collection, plaintiffs argue that those "characteristics" still bear no "reasonable relationship to the object of the legislation."

A property's accessibility to curbside collection is a valid factor that a municipality may consider in its decision to offer refuse collection. In *Beztak Co v Farmington Hills*,[5] this Court held that a city's refusal to offer garbage collection service to apartments with no curbside access did not violate equal protection in light of the problems associated with rubbish collection from private streets not

[5] 136 Mich App 664, 668-669; 358 NW2d 25 (1984).

built to the city's specifications and the city's legitimate interest in reducing costs and promoting efficiency in rubbish collection.

Defendant city herein argues properly that the volume of rubbish generated is also a valid consideration for a municipality seeking to promote efficiency and to encourage waste reduction among its residents. Plaintiffs respond by claiming that neither the volume of rubbish generated nor a property's accessibility to curbside collection were rational bases upon which to impose a fee on dumpster users, particularly in view of the object of the legislation, namely, a more equitable allocation of the cost of a city's refuse collection service. Plaintiffs attempt to support their position by claiming dumpster collection is less expensive per dwelling and per cubic yard of refuse collected than curbside collection.

Plaintiffs' argument is not without its weaknesses. First of all, the cost per dwelling unit for dumpster collection became less expensive than curbside collection only *after* the adoption of ordinance 470. In fact, even in 1980, the cost per dwelling unit for dumpster collection was *more* expensive than for curbside collection. The increased efficiency of the dumpster collection service resulted in no small part because of the impact of the ordinance itself. Because of the fee, a large number of high density, multiple-family dwellings opted to use private haulers instead of the city's refuse collection service. These high-density dwellings (including many of the original plaintiffs) were disproportionately expensive per dwelling unit to service, and their exodus from the system no doubt helped drop the per dwelling unit cost of dumpster collection below that of curbside collection from 1981 onward. Dumpster collection also became more efficient due to a switch by the

city in 1979-1980 from rear-end loading trucks to front-loading trucks, which required one less person to operate. The city points to this increased efficiency and argues that this only verifies its claim that the collection fee was rationally related to the object of the ordinance. It contends that "the most costly units were either required to conform, or could opt out and utilize other rubbish collection services. That efficiency, recognized in a reduction in cost, represented a savings to all residents of the City." Thus, the city argues that the ordinance "in fact generated the desired result."

Even accepting the parties' stipulation and the trial court's finding that "refuse collection service, through the dumpster method of collection generally is more efficient and cheaper on a unitized basis of measurement than refuse collection through the curbside method of collection," it is not clear from the case law that, because of this cost differential, the ordinance is a violation of equal protection. In *Rouge Parkway, supra,* the Supreme Court reviewed whether a one percent collection fee assessed upon property taxes paid before February 15 violated the equal protection clause of the Michigan Constitution. The plaintiffs in *Rouge Parkway* were commercial property owners who argued that the tax collection fee, which was calculated as a percentage of their property taxes, resulted in their paying more than most taxpayers for a service that was unrelated to the value of the property and that such a result constituted an "irrational and arbitrary classification."

The *Rouge Parkway* Court affirmed prior case law to the effect that

> to pass the test of a "regulatory fee," an exaction must not produce revenue in excess of the cost of

the regulation. *Bray v Dep't of State,* 418 Mich 149, 160; 341 NW2d 92 (1983). However, we have never held that the costs of a given regulation must be shared equally by all, *i.e.,* that it is impermissible to charge someone more than their pro-rata share of the cost.[6]

In *Rouge Parkway,* the Court later noted its agreement with the trial court that "the burdens of government do not have to be shared by the taxpayers on a pro-rata basis"[7] and declared that a "fee or tax based on the fee payer's or the taxpayer's pro-rata share of the cost of the instant government service was certainly reasonable, but it is not the only reasonable principle or basis on which to assess such an exaction."[8] Observing that there had been no showing that the total revenues collected exceeded the cost of either the collection or the administration of the collection fee, the *Rouge Parkway* Court went on to hold that the plaintiffs had not met their burden of showing that the effect of the provision on individual taxpayers was arbitrary or unreasonable under Michigan's equal protection clause.

Similarly, this Court has held that rate classifications based on something other than the cost of the municipal service provided will pass muster under equal protection analysis. In *Village Green of Lansing v Bd of Water & Light,*[9] the municipal utility charged commercial rates rather than the lower residential rates for the "common areas" in multiple-family dwellings. Applying the two-part *Alexander* test, the *Village Green* Court upheld the rate schedule against an equal protection challenge despite the fact of the municipality's conces-

---

[6] *Rouge Parkway, supra* at 419.

[7] *Id.* at 420-421.

[8] *Id.* at 423.

[9] 145 Mich App 379, 391; 377 NW2d 401 (1985).

sion that there was little distinction between the cost of the service rendered to its commercial versus its residential customers. The Court found a rational basis for the classification in the commercial nature of the defendant's operations.

Thus, though it is permissible and reasonable for a municipality to charge for services rendered to its citizens based on the pro-rata cost of that service, this is not mandatory. Even so, defendant city must still prove that the bases for its fee assessment, i.e., the volume of rubbish generated and accessibility to curbside collection, are reasonably related to the object of the legislation. The object of the ordinance and the fee assessment in particular is apparent from the statement of legislative purpose in the ordinance. Its object was to more equitably allocate the cost of refuse collection among the city's residents, specifically to require multiple-family dwellings to pay more of their fair share of the cost of the service.

Plaintiffs argue that the city's classifications are not reasonably related to that stated objective, since the per unit cost of dumpster collection is cheaper than the per unit cost of curbside collection. Thus, since among residential properties only multiple-family dwellings were required to use dumpsters and pay the fee, the fee assessment as structured exacerbated rather than relieved the inequitable allocation of the cost of the refuse collection service among its residential users. Accordingly, they argue, the fee assessment was based on an unconstitutionally irrational and arbitrary distinction.

Ordinance 470 would be an unconstitutionally irrational and arbitrary means for the city to accomplish its stated objective only if the equal protection clause required the city to ignore how much the various entities using its refuse collec-

tion service contribute in the way of taxes. It is hard to see how a city can achieve a fair allocation of the cost of its refuse collection service if it must ignore how much the users of that service have already paid for it in the form of taxes. The whole thrust of plaintiffs' arguments about the relative per unit cost of refuse collection is that multiple-family dwellings are being forced to bear a disproportionate share of the cost of the city's refuse collection service. The city's property tax figures appear to belie this conclusion.

First of all, the portion of the fee revenues collected from multiple-family dwellings does not appear to have exceeded the cost of providing them refuse collection service. Secondly, even if these collection fee revenues are added to the property tax contribution of multifamily dwellings, their contribution does not cover the full cost of the refuse collection service provided them. Third, and most important for the sake of equal protection analysis, in comparison to the property tax contribution of the single and two-family dwellings, the multifamily dwellings have consistently paid a disproportionately small share of the cost of refuse collection. This appears to be true even if the contribution of the multiple-family dwellings in the form of fee revenues is taken into account.

Admittedly, the city's reliance on relative property tax contributions in assessing its fee schedule is not without its weaknesses. Refuse collection in East Lansing is paid for out of the general fund, not solely out of property tax revenues. For each of the fiscal years ending in 1980 through 1984, property tax revenues constituted approximately forty-two percent of the city's general fund. Thus, it is not entirely accurate to say that property taxes and fee revenues are the only contribution multifamily dwellers make toward the payment of

the cost of refuse collection. Apparently general fund revenues are also obtained from other sources, such as state and federal revenue sharing, court fines, license fees and service fees.

Nonetheless, property taxes are the city's single largest source of revenue, and other city services, such as police and fire protection and maintenance of the city's judicial system, must also be paid out of the general fund. In addition, plaintiffs do not attempt to refute the assertion that multifamily dwellings in the city contribute a disproportionately small amount of tax revenue in comparison to the tax contribution of single and two-family dwellings and also in terms of the cost of providing them refuse collection. Plaintiffs and the trial court say only that the city cannot use its refuse collection fee to remedy property tax inequities and that the city must focus instead on a relative per unit cost providing refuse collection to multi- and single-family dwellings.

We do not believe that the case law holds that in setting fees for municipal services the municipality may not consider the relative tax contributions of the users of those services. Unless plaintiffs can establish that the city's use of the relative tax contributions of the users of its collection service in setting its fee was not reasonably related to its goal of a more equitable allocation of the cost of the service, then ordinance 470 did not deny them equal protection of the law. We do not believe that plaintiffs have carried that burden of proof. The use of property tax figures to set fee rates for municipal services is, in the most literal sense of the word, rationally related to the city's legislative goal of more equitably allocating the costs of those services, and this is not improper under the current test for equal protection. Thus,

we believe the trial court was in error in deciding to the contrary.

Even though we hold that the equal protection clause does not prevent the city from considering the relative tax contributions of its residents in setting fees for municipal services, we review further to determine if such a practice is forbidden by other legal principles. Defendant next claims that the trial court erred by concluding that its rubbish collection fee was an unconstitutional tax passed under the guise of a regulatory fee. To pass judicial scrutiny, as noted above, a " 'regulatory fee' . . . must not produce revenue in excess of the cost of the regulation."[10] In *Foreman v Oakland Co Treasurer*,[11] we reviewed the validity of a fee charged for the administration of probated estates. Relying on *Vernor v Secretary of State*,[12] the *Foreman* Court stated that "statutorily enacted fees are presumed reasonable, but may be found constitutionally infirm, if they bear no reasonable relationship to the expense for which they are chargeable."[13]

The trial court in the instant case relied on Foreman to strike down ordinance 470, saying:

> The evidence presented shows that it costs the city less to collect refuse from the property owners who are charged a fee than to collect from homeowners who are not charged a fee. Consequently, the fee bears "no reasonable relationship to the expense for which they are chargeable." As such, the fee must be construed as a tax, an unlawful, unconstitutional revenue raising measure by which the City attempted to equalize property taxes of single and multi-unit property owners.

[10] *Rouge Parkway, supra* at 419.
[11] 57 Mich App 231; 226 NW2d 67 (1974).
[12] 179 Mich 157; 146 NW 338 (1914).
[13] *Foreman, supra* at 237.

We do not agree with the trial court's interpretation of the holdings in *Vernor* and *Foreman, supra.* In *Foreman,* this Court upheld a probate fee based upon a flat percentage of the value of the estate. The *Foreman* Court sustained the fee because the plaintiffs had failed to produce sufficient evidence that the fee bore no reasonable relationship to the expenses of administering the decedent's estate.

In *Vernor,* the Supreme Court invalidated a license fee for motor vehicles. The license fee increased according to the horsepower of the vehicle. The Court found the fee to be a tax passed "under the guise of regulation" and, since taxation was not a purpose covered by the title of the act, the Court held that the enactment violated the title-object clause of the Michigan Constitution. The *Vernor* Court stated that regulatory fees would be upheld "when plainly intended as a police regulation, and the revenue derived therefrom is not disproportionate to the cost of issuing the license, and the regulation of the business to which it applies."[14] However, the court also said that "[i]f, upon investigation, the fee is found to be only sufficient to pay the expense that may reasonably be presumed to arise in the supervision and regulation of the automobile licensed, its disposition (i.e., whether the fee is used for purposes other than defraying the cost of the regulation) should not have the effect of converting it into a tax."[15]

We believe *Vernor* and *Foreman* hold that a regulatory fee will be construed as an illegal tax only where the revenue generated by the regulation exceeds the cost of the regulation. Even though Michigan courts have emphasized that

[14] *Vernor, supra* at 167.
[15] *Id.* at 169.

state and local governments cannot impose taxes under the guise of a regulatory fee, we know of no Michigan case that has construed a regulatory fee to be a tax where the revenue produced by the fee did not significantly exceed the cost of the regulation. Since the revenue generated by the city refuse collection fee does not appear to have ever exceeded the cost of the service rendered to multi-family dwellings, we believe that the trial court erred in construing the fee to be a tax passed illegally under the guise of a regulatory measure.[16]

In *Rouge Parkway, supra,* the Supreme Court commented on the *Foreman* decision as follows:

> We certainly agree that the fee designed to coincide with the cost of administering the fee payer's estate was reasonably based, but, as we conclude here, we do not agree that any other basis would necessarily be unreasonable."[17]

Furthermore, the city's refuse collection fee would be unreasonably related to the cost of refuse collection only if the city were forced to ignore the relative tax contributions of the users of that service. As previously indicated, we do not believe the equal protection clause requires the city to ignore such relevant information.

We would also point out that the city's garbage collection fee is not an involuntary exaction for general governmental services, but, rather, is imposed solely to defray the costs of a specific service. Many of the large multifamily residences in the city have now asked for private haulers and need no longer pay the fee. Even though the fees col-

---

[16] For a case in another jurisdiction refusing to construe similar exactions for refuse collection to be taxes where the fee revenues did not exceed the cost of the service rendered, see *Craig v City of Macon,* 543 SW2d 772, 774, (Mo, 1976).

[17] *Rouge Parkway, supra* at 420, n 5.

lected are placed into the general fund, the fees generated have never fully covered the cost of the garbage service provided.

If we were to find the city's garbage collection fee to be a "tax," then plaintiffs are probably correct in concluding that it is an improperly promulgated and levied tax. But, this would not be because the tax violates the uniformity of taxation clause[18] for, "[a]s a practical matter, in cases involving taxing statutes, there is no discernible difference between the Equal Protection and Uniformity of Taxation Clauses."[19] And, as already noted, we do not believe the city's fee violated the equal protection clause. Rather, it would be improper because, when viewed as an ad valorem tax, ordinance 470 did not distinctly state the tax, as required by Const 1963, art 4, § 32. If viewed as imposing a non-ad valorem tax, ordinance 470 did not distinctly state the tax and was not approved by a majority of the qualified electors of the city, in violation of Const 1963, art 9, § 31.

In conclusion, we do not believe that condoning the consideration of the relative tax contributions of city residents in setting fees for municipal services will result in the massive use of "regulatory fees" as underground taxes. First of all, the principles of both *Vernor* and *Foreman, supra,* insure that this tactic will not be used to accumulate revenue in excess of the cost of the service rendered. Thus, such fees will not be used as a means to subsidize other municipal services. Secondly, the equal protection clauses of the Michigan and United States Constitutions provide adequate protection against attempts to place the burden of such fees on a class of persons based on completely

---

[18] Const 1963, art 9, § 3.

[19] *Armco Steel Corp v Treasury Dep't,* 419 Mich 582, 592; 358 NW2d 839 (1984).

arbitrary or unlawful factors. Forbidding municipalities from relying on the relative tax contributions of its residents in imposing regulatory fees would only perpetuate the inequities inherent in relying primarily on property taxes to fund essential municipal services.

Finally, defendant argues that the trial court erred in determining that it was required to return fees collected from all affected properties. After holding that the portion of ordinance 470 which provides for a rubbish collection service charge for properties utilizing dumpster service be stricken, the trial court ordered the city to "reimburse affected properties for fees collected pursuant to Ordinance 470." As previously indicated, in a pretrial stipulation the parties agreed that only the liability issue would be heard at the trial set for June 4, 1985, and that, if the trial court ruled in plaintiffs' favor, damages would be measured in a subsequent proceeding, possibly involving the appointment of a special master. This stipulation was read into the record at trial by plaintiffs' counsel, and the court raised no objections. As we have concluded that ordinance 470 is not unconstitutional, we have no necessity to review that subject. Fees need not be reimbursed.

In summary, we hold that the trial court erred in concluding that the rubbish collection ordinance of defendant city violated the equal protection clauses where multifamily dwellings were assessed a fee for dumpster collection, but single and two-family dwellings using the city's curbside collection service were charged no fee. The trial court also erred by concluding that defendant city's rubbish collection fee was an unconstitutional tax. We further find that, since it was error to hold the ordinance unconstitutional, it was also error for

the trial court to hold that defendant city was required to return all fees collected from all affected properties.

Reversed.