*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

NESTLÉ WATERS NORTH AMERICA, INC.,

Plaintiff-Appellee,

v

TOWNSHIP OF OSCEOLA,

Defendant-Appellant.

UNPUBLISHED
December 3, 2019

No. 341881
Osceola Circuit Court
LC No. 17-014990-AA

Before: STEPHENS, P.J., and SERVITTO and RONAYNE KRAUSE, JJ.

PER CURIAM.

Defendant, Osceola Township, appeals by leave granted[1] the circuit court's order overturning the decision of defendant's planning commission denying the request of plaintiff, Nestlé Waters North America, Inc., for a permit to construct a booster-pump building on a location zoned for agricultural uses. The circuit court ordered defendant to issue plaintiff the zoning permit. We reverse.

## I. BACKGROUND

The circuit court's order summarized the background facts as follows:

> [Plaintiff] currently operates a well house and a water pipeline in Osceola County. This project was constructed in 2008 and transports water pumped from a well at White Pine Springs to a load station located in Evart, Michigan. The pipeline runs in part across real property owned by Spring Hill Camps. Spring Hill Camps has consented to allow [plaintiff] to build the building in question on their property. This would allow the booster pump to be installed near the midpoint of the pipeline. The property owned by Spring Hill Camps is located in Osceola Township in the A-1 (Agricultural) Zoning District.

---

[1] *Nestlé Waters North America, LLC v Osceola Twp*, unpublished order of the Court of Appeals entered July 18, 2018 (Docket No. 341881).

-1-

[Plaintiff] requested zoning approval to build a 12' x 22' building which would house a booster pump along the existing pipeline. On November 22, 2016, the Planning Commission adopted two resolutions finding that the booster-pump building complies with all standards applicable to special land uses as stated in . . . the zoning ordinance; however, it denied the zoning-request finding that the request fell . . . under the classification of "essential service" and, therefore, applied a "public convenience and necessity" standard. Neither the meeting minutes nor a resolution of the Planning Commission contains any reason or explanation why this project was classified as an essential service. The Planning Commission found that this "public convenience and necessity" standard was not met. The Zoning Board of Appeals ended in a 1:1 tie vote; and pursuant to the zoning ordinance, a tie vote results in the Planning Commission's decision being upheld.

Plaintiff pursued the booster-pump facility in anticipation of obtaining final approval of its request to substantially increase the amount of water it is permitted to withdraw from its White Pine Springs well, also known as PW-101, which pumps water from the ground in Osceola Township for plaintiff's commercial production and sale of bottled drinking water. Plaintiff's permit to increase how much water it is permitted to pump is the subject of other proceedings and is not before us in this matter, although we have taken judicial notice of some of plaintiff's public submissions in that matter.

The circuit court reversed the Zoning Board of Appeals (ZBA), reasoning that water was essential and plaintiff's commercial bottling operation supplied a public demand, so plaintiff's proposed booster pump facility was an essential public service. The circuit court concluded that, as a consequence, the Planning Commission and ZBA erred by addressing public convenience and necessity. The circuit court therefore ordered defendant to issue the requested zoning permit.

## II. STANDARD OF REVIEW

In an appeal from a ZBA, we review de novo the circuit court's decision and any questions of law such as the interpretation of a zoning ordinance. *Risko v Grand Haven Charter Twp Zoning Bd of Appeals*, 284 Mich App 453, 458-459; 773 NW2d 730 (2009). We "defer to determinations of fact made by an appeals board if supported by competent, material, and substantial evidence on the record," and we defer to the board's decisions based on those factual determinations "provided they are procedurally proper . . . and are a reasonable exercise of the board's discretion." *Macenas v Village of Michiana*, 433 Mich 380, 395; 446 NW2d 102 (1989). In contrast, the ZBA's determinations of law are afforded no deference. *Id*. at 395-396. Likewise, application of the law to the facts is also reviewed de novo. *Hughes v Almena Twp*, 284 Mich App 50, 60; 771 NW2d 453 (2009). Ordinances are construed in the same manner as statutes. *Ballman v Borges*, 226 Mich App 166, 167; 572 NW2d 47 (1997).

The "purpose of statutory construction is to ascertain and give effect to the intention of the Legislature" as plainly expressed in unambiguous language. *Browder v Int'l Fidelity Ins Co*, 413 Mich 603, 611; 321 NW2d 668 (1982). To the extent construction is necessary, the rules of statutory construction are useful guides, but the intent of the Legislature, once discovered, must

prevail over any other rules of construction or "dogged literalism." *Amburgey v Sauder*, 238 Mich App 228, 231-232; 605 NW2d 84 (1999) (internal quotation omitted). Words in a statute are to be given their ordinary meanings in context unless defined within the statute itself. *Yudashkin v Linzmeyer*, 247 Mich App 642, 649-650; 637 NW2d 257 (2001). Attempting to construe a word in a statute by relying on a definition provided by a different statute is generally improper. *Coalition Protecting Auto No-Fault v Michigan Catastrophic Claims Ass'n*, 317 Mich App 1, 19; 894 NW2d 758 (2016).

### III. "ESSENTIAL PUBLIC SERVICE"

As an initial matter, the circuit court's conclusion that plaintiff's commercial water-bottling operation is an "essential public service" is clearly erroneous. The Osceola Township Zoning Ordinance[2] (the Ordinance) references, but does not define, "essential public services" in the catchline of § 2.8, which provides:

> The erection, construction, alteration, or maintenance of essential services, shall be permitted as authorized or regulated by law and other ordinances in any use District, it being the intention hereof to exempt such erection, construction, alteration, and maintenance from the application of this Ordinance, except those which may be considered a danger to the community health, safety, and welfare.

The Ordinance further provides:

> It shall be lawful for essential public services to establish and conduct themselves in any district of the Township, and except as hereinafter provided, the erection, construction, alteration or maintenance of essential services shall be permitted in any district as authorized or regulated by law and other ordinances of the Township, it being the intention hereof to except such erection, construction, alteration and maintenance from the application of this ordinance except as hereinafter provided.

> The erection or construction of any building or structure for essential services, including but not limited to electrical substations, gas regulator stations, sanitary treatment facilities or other similar facilities shall be designed and erected to conform harmoniously with the general architecture and plan of such district in which they are to be erected, shall not interfere with the planned use of such district, and shall be subject to the prior approval of the Planning Commission. Plans and specifications for such building or structure shall be tendered to the Zoning Administrator and the Planning Commission as a prerequisite of such approval; furthermore, the Planning Commission shall have the power to permit

---

[2] The parties do not appear to have provided us with a complete copy of the Ordinance, but we take judicial notice of the Ordinance in its entirety pursuant to MRE 202(a). See: http://www.osceola-county.org/residents/townships/osceola_township/zoning_ordinance_new.php

any essential public service to erect and use an essential service building or structure in any permitted district, to a greater height or of a greater area than the district requirements established; provided such board shall find such structure or building necessary for public convenience and necessity. [*Id.*, § 21.3.]

However, the Ordinance does not define the words "essential" or "service." The Ordinance does state in § 13.1 that "[a]gricultural production is essential to the public health, safety, and welfare," and that the A-1 agricultural district was explicitly to be "unimpeded by the establishment of incompatible uses of land which would hinder agricultural practices and irretrievably deplete essential agricultural lands and productivity."

We agree with the trial court's observation that water is essential to human life, as well as to agriculture, industry, recreation, science, nature, and essentially everything that humans need. However, the trial court went on to conclude that because selling bottled water at a profit supplies a public demand somewhere, it constitutes a "public service." A "public service" means "the business of supplying a commodity (as electricity or gas) or service (as transportation) to any or all members of a community" or "a service rendered in the public interest." *Merriam-Webster's Collegiate Dictionary* (11th ed). The first definition would not be unreasonable if the sale of bottled water approximated a public utility subject to regulation by the Public Service Commission or a similar entity. The second definition would not be unreasonable if plaintiff was primarily in the business of supplying bottled water to areas that lacked any other source of potable water.[3] Plaintiff's commercial operation satisfies neither understanding of a "public service." Furthermore, other than in areas with no other source of water, *bottled* water is not essential.[4] The trial court erred in effectively concluding that because water is essential, the provision of water in any form, manner, or context is necessarily an "essential public service."

Plaintiff contends that its PW-101 well constitutes a "public water supply" pursuant to MCL 325.1002(p), part of the Michigan Safe Drinking Water Act (MSDWA), MCL 325.1001 *et seq*. We will discuss below why we disagree with this contention. However, in addition, the definition given to a word in one statutory scheme does not necessarily apply to the same word left undefined in another statutory scheme. Even if plaintiff's well is a "public water supply" under the MSDWA, that status would have little bearing on whether it is a "public service" under

---

[3] We take notice of the publicly recognized fact that, to its credit, plaintiff does provide bottled water to some areas not otherwise served by safe and reliable drinking water. However, it is equally clear that, no matter how commendable it might be, doing so is only an incidental portion of plaintiff's business.

[4] In *Kersheske v Thomas Twp*, 2 Mich App 1, 4; 138 NW2d 509 (1965), a panel of this Court opined that the term "essential services," which an ordinance at issue did not define, referred to services provided by the municipality. The term "essential services" is not identical to "essential public services," and the context of the ordinance in *Kersheske* is also distinguishable. Nevertheless, *Kersheske* supports our conclusion that "essential public services" are in the nature of utilities or services provided by a public entity and generally necessary for inhabitants of a particular geographic locality to live in reasonable comfort.

the Ordinance. We conclude that the trial court erred in concluding that plaintiff's facility can be deemed an "essential public service" within the meaning of the Ordinance.

## IV. SPECIAL USE PERMIT IN THE ALTERNATIVE

Plaintiff contends that, in the alternative, its booster-pump facility is entitled to a special land-use permit. We disagree.

Presuming plaintiff's proposed booster-pump facility could be deemed in furtherance of an essential public service, § 21.3 of the Ordinance provides that structures must not "interfere with the planned use of such district." Plaintiff's booster-pump facility is not among the enumerated uses permitted by right under § 13.2. It is also not among the enumerated uses requiring a special use permit under § 13.3, except possibly an "extractive operation" under § 13.3.7 or for "bulk collection, storage and distribution of agricultural products" under § 13.3.2. As we will discuss, we cannot find that plaintiff's facility would constitute either such use.

As an initial matter, the trial court did not decide this issue, although the parties argued this issue below. An issue is preserved for our review if raised by a party and pursued on appeal, irrespective of whether the trial court addresses it. *Peterman v Dep't of Natural Resources*, 446 Mich 177, 183; 521 NW2d 499 (1994). Nevertheless, this Court's order granting leave was "limited to the issues raised in the application and supporting brief." Defendant elected not to "belabor" the issue in its application for leave to appeal, but it did assert that plaintiff's facility does "not fit within any of the special uses allowed within the A-1 Agriculture District in Zoning Ordinance § 13.3." As a general matter, this Court will not refuse to entertain an issue merely because a party subsequently makes a more sophisticated or fully-developed argument. See *Steward v Panek*, 251 Mich App 546, 554; 652 NW2d 232 (2002). Thus, we conclude that, although minimal, this issue was raised in defendant's application for leave. More importantly, we simply cannot determine whether a given facility violates the constraint in § 21.3 against interferences with the planned use of a district without determining whether the facility would be permissible within that district pursuant to a special use permit. Thus, considering whether the facility could fall within § 13.3.7 or § 13.3.2 is necessary to completely resolve the instant appeal. See *id*.

Plaintiff's proposed booster-pump facility is clearly not permitted under § 13.3.2, under which a facility for "bulk collection, storage and distribution of agricultural products" may be permitted. First, there is nothing in the context of § 13.3.2 suggesting that the enacting body intended the word "and" to be disjunctive. See *Heckathorn v Heckathorn*, 284 Mich 677, 680-682; 280 NW 79 (1938). Thus, plaintiff's proposal cannot satisfy § 13.3.2 because no storage is to occur at the facility. Secondly, § 13.3.2 only applies to agricultural products. The Ordinance defines "agriculture" in § 12.2 as "the use of land for tilling of the soil, raising trees or field crops or animal husbandry, as a source of significant income." Water is certainly necessary for agriculture. However, a "product" generally means "something produced." *Merriam-Webster's Collegiate Dictionary* (11th ed). Therefore, an "agricultural product" would mean some result of agriculture, rather than something consumed by agriculture. In any event, the fact that water can be used for agriculture does not make a commercial water bottling operation "agricultural." Plaintiff's proposed booster-pump facility therefore cannot be for "agricultural products" as required by § 13.3.2.

Whether plaintiff's proposed booster-pump facility is an "extractive operation" under § 13.3.7 is less obvious. No water is removed from the water table at the facility; rather, the facility is to be used only to transfer water that had already been removed from the water table elsewhere. "Extractive" is not defined in the Ordinance. Again, we give words undefined in a statute their ordinary meanings in context and avoid applying definitions from other statutory schemes by rote.[5] *Yudashkin*, 247 Mich App at 649-650; *Coalition Protecting Auto No-Fault*, 317 Mich App at 19. To "extract" means, in relevant part, "to pull or take out forcibly." *Merriam-Webster's Collegiate Dictionary* (11th ed). Thus, no extraction of water is to occur at the facility.

Nevertheless, in an agricultural context, "extractive" refers to "*tending toward or resulting in* withdrawal of natural resources by extraction with no provision for replenishment." *Merriam-Webster's Collegiate Dictionary* (11th ed) (emphasis added). Plaintiff argues that even if transferring water is not *extraction*, it is in context an inextricable part of plaintiff's *extractive* operation. Although this argument is not unreasonable, the courts must apply a construction of a statute consistent with the object and purpose of a statute, to the extent that doing so does not contravene the plain language of the statute. *City of Grand Rapids v Crocker*, 219 Mich 178, 182-186; 189 NW 221 (1922). Here, the legislative body has explicitly and officially enacted a statement of its intent and the purpose of this particular ordinance provision in § 13.1. We are therefore bound to construe § 13.3.7 within that context. See *People v Tucker*, 312 Mich App 645, 660; 879 NW2d 906 (2015); *Wilkins v Gagliardi*, 219 Mich App 260, 272; 556 NW2d 171 (1996); *Iroquois Prop v City of East Lansing*, 160 Mich App 544, 559-561; 408 NW2d 495 (1987); *ACCO Indus, Inc v Dep't of Treasury*, 134 Mich App 316, 321-322; 350 NW2d 874 (1984). As noted, under § 13.1, the A-1 district specifically forbids uses that would "irretrievably deplete essential agricultural lands and productivity." "Irretrievable" means "impossible to regain or recover." *Merriam-Webster's Collegiate Dictionary* (11th ed).

Presuming plaintiff's booster-pump operation is an "extractive operation," it is part of extracting a resource critical to agricultural lands and productivity. The phrasing of § 13.1 does not mention "resources," but depleting a resource critical to agricultural lands and productivity necessarily depletes the lands and productivity. Even if an "extractive operation" need not provide for replenishment of a resource, the Ordinance does not permit "extractive operations" that *irretrievably* deplete any such resource. According to plaintiff's own documentation, the effect of its pumping operation will be to "draw down" the water table in the vicinity. *Section 17 of Michigan Safe Drinking Water Act Application Information Package for Production Well PW-101*, July 2016, pp 12, 23.[6] "Draw down," or "drawdown," means "a lowering of a water level (as in a reservoir), "the process of depleting," or "to deplete by using or spending." *Merriam-Webster's Collegiate Dictionary* (11[th] ed). Thus, plaintiff's pumping operation ultimately does deplete a critical agricultural resource faster than the aquifer can replenish itself. Plaintiff contends that the draw down will be modest, local, and not affect other wells' ability to produce

---

[5] We therefore reject plaintiff's reliance on MCL 205.94p, which is part of the Use Tax Act (UTA), MCL 205.91 *et seq*. The UTA is even less relevant to this matter than is the MSDWA.

[6] https://www.michigan.gov/egle/0,9429,7-135-3313_3675_3692-396999--,00.html

water. Nevertheless, extracting the water and sending it to other places where it cannot return to the water table, and, critically, doing so faster than the aquifer can replenish, *is* an "irretrievable" depletion unless the pumping is reduced or halted. Nothing in § 13.1 requires the effect to be immediately cataclysmic.

In order for plaintiff's proposed booster-pump facility to be considered an "extractive operation" under § 13.3.7, it must be deemed part of plaintiff's extractive process. The evidence shows that the process itself would conflict with the prohibition in § 13.1 against irretrievably depleting a resource critical to agriculture. Denying plaintiff's zoning request on that basis would be proper. In summary, plaintiff's proposed booster-pump facility cannot be considered an "essential public service," and, even if it could be considered an "essential public service," it would still impermissibly interfere with the planned uses of the A-1 agricultural district. Therefore, trial court erred by reversing the ZBA's decision on the basis of plaintiff's proposal constituting an "essential public service."

## V. STATUTORY PROHIBITIONS AGAINST ZONING DENIAL

Plaintiff relies on statutes within the Natural Resources and Environmental Protection Act (NREPA), MCL 324.101 *et seq.*, and the Michigan Safe Drinking Water Act (MSDWA), MCL 325.1001 *et seq.*, either in direct or indirect support of its claimed entitlement to its requested zoning permit. We are unable to find those statutes helpful to plaintiff.

## A. NATURAL RESOURCES AND ENVIRONMENTAL PROTECTION ACT

Plaintiff contends that a denial of its zoning request would contravene MCL 324.32726, part of the NREPA. We disagree.

In relevant part, MCL 324.32726 provides that "[e]xcept as authorized by the public health code, 1978 PA 368, MCL 333.1101 to 333.25211, a local unit of government shall not enact or enforce an ordinance that regulates a large quantity withdrawal." Plaintiff argues that defendant's denial of its requested zoning permit was aimed at precluding plaintiff from drawing more water from its well. This is simply plaintiff's own interpretation of what has transpired. Ultimately, the Township is attempting to enforce its zoning ordinances. Enforcing a zoning ordinance is neither exceptional nor forbidden.

Furthermore, defendant's denial of the permit will not have the effect of regulating plaintiff's water withdrawal. The NREPA defines "withdrawal" as "the removal of water from surface water or groundwater." MCL 324.32701(1)(ss). We must apply the NREPA's provided definitions when construing a statute within the NREPA. See *Yudashkin*, 247 Mich App at 649-650; *Coalition Protecting Auto No-Fault*, 317 Mich App at 19. As plaintiff explains, the actual removal of water from the ground occurs elsewhere. The booster-pump facility is only a means for transporting that water. Even if plaintiff's proposed facility should be considered part of an "extractive operation" under § 13.3.7 of the Ordinance, no "withdrawal" within the meaning of the NREPA will occur at the facility. Plaintiff has other available ways to transport the water.

Thus, denying a zoning permit for the facility does not have the effect of regulating plaintiff's removal of water from the ground.[7]

## B. MICHIGAN SAFE DRINKING WATER ACT

As noted above, plaintiff contends that its PW-101 well constitutes a "public water supply" under the MSDWA. We disagree. Importantly, the MSDWA provides a number of relevant definitions. MCL 325.1002 provides,[8] in relevant part, as follows:

(a) "Bottled drinking water" means water that is ultimately sold, provided, or offered for human consumption in a closed container.

\* \* \*

(c) "Community supply" means a public water supply that provides year-round service to not fewer than 15 living units or which regularly provides year-round service to not fewer than 25 residents.

\* \* \*

(e) "Customer service connection" means the pipe between a water main and customer site piping or building plumbing system.

\* \* \*

(k) "Noncommunity supply" means a public water supply that is not a community supply, but that has not less than 15 service connections or that serves not fewer than 25 individuals on an average daily basis for not less than 60 days per year.

(l) "Nontransient noncommunity water supply" means a noncommunity public water supply that serves not fewer than 25 of the same individuals on an average daily basis over 6 months per year. This definition includes water supplies in places of employment, schools, and day-care centers.

\* \* \*

---

[7] Although not strictly part of the statute and thus not binding authority, we observe that MCL 324.32726 is placed in the "The Great Lakes" division of the NREPA, MCL 324.32101-324.34201. It does *not* occur in the separate "Inland Waters" division of the NREPA, MCL 324.30101-324713. Therefore, we are uncertain whether the Legislature truly intended MCL 324.32726 to apply to groundwater or aquifers. Nevertheless, that concern is not before us and would not affect the outcome in this matter.

[8] The MSDWA is subject to part 14 of the NREPA. MCL 325.1023. However, we have not found any definitions in part 14 of the NREPA, MCL 324.1401 to 324.1429, that appear relevant.

-8-

(p) "Public water supply" means a waterworks system that provides water for drinking or household purposes to persons other than the supplier of the water, and does not include [certain irrelevant exceptions].

\* \* \*

(r) "Service connection" means a direct connection from a distribution water main to a living unit or other site to provide water for drinking or household purposes.

\* \* \*

(t) "Supplier of water" or "supplier" means a person who owns or operates a public water supply, and includes a water hauler.

\* \* \*

(w) "Water main" means a pipe owned or controlled by a supplier that may convey water to a customer service connection or to a fire hydrant.

(x) "Waterworks system" or "system" means a system of pipes and structures through which water is obtained and distributed, including but not limited to wells and well structures, intakes and cribs, pumping stations, treatment plants, storage tanks, pipelines and appurtenances, or a combination thereof, actually used or intended for use for the purpose of furnishing water for drinking or household purposes.

We must apply the above definitions in construing the MSDWA. *Yudashkin*, 247 Mich App at 649-650; *Coalition Protecting Auto No-Fault*, 317 Mich App at 19.

The MSDWA does not define or explain what it means by "for drinking or household purposes." However, it is noteworthy that bottled drinking water is defined as being for "consumption," rather than "drinking or household purposes," and it is set forth independently from any kind of "supply." We generally presume that the Legislature intends different meanings if it uses different words. *United States Fidelity Ins & Guaranty Co v Mich Catastrophic Claims Ass'n* (*On Rehearing*), 484 Mich 1, 14; 795 NW2d 101 (2009). We also strive to give harmonious effect to all provisions of a statute. *Mich Basic Prop Ins Ass'n v Ware*, 230 Mich App 44, 49; 583 NW2d 240 (1998). Water "supplies" appear to contemplate water being conveyed to a site through pipes, whereas bottled water specifically involves "a closed container." In other words, although not stated in lay terms, the MSDWA unambiguously provides that a "water supply" is something akin to tap water, and "bottled water" is distinct.

Consequently, there is no legal or factual basis for considering plaintiff's commercial water bottling operation to be a "public water supply" under the MSDWA. Plaintiff nevertheless contends that the PW-101 well is a "public water supply," relying on a 2008 permit issued by the Michigan Department of Environmental Quality (MDEQ) for its PW-101 pump, and a 2009 "source approval letter" also from the MDEQ. The 2008 permit does not mention a "public water supply" specifically, but it does include connecting the well to the City of Evart's water main. The permit, therefore, arguably supports the proposition that the PW-101 well does at

least in part supply drinking or household water, and to that extent may indeed constitute part of a "public water supply."

The 2009 letter states that the well "is classified as a nontransient noncommunity water system (Type IIa) under the [MSDWA]." Pursuant to MCL 325.1002(*l*), a "nontransient noncommunity water system" is a kind of "public water supply." Although the MDEQ's interpretation of the MSDWA is entitled to respectful consideration, we are not bound to accept it, especially where it clearly conflicts with the plain language of a statute. See *In re Complaint of Rovas Against SBC Michigan*, 482 Mich 90, 103-104; 754 NW2d 259 (2008). By definition, a "public water supply" consists of a "waterworks system" that may include a well, but that does not mean the well *is* the "public water supply." A "public water supply" is unambiguously an interconnected system. It is not one specific piece of the system's discrete components. Thus, the PW-101 well might be a part of a public water supply to the extent it supplies tap water to the City of Evart, but *in itself* the well cannot be a public water supply. Furthermore, it cannot be a public water supply to the extent it is part of a commercial water-bottling operation.

Furthermore, under the MSDWA, the MDEQ has "power and control over public water supplies and suppliers of water," but only "[s]ubject to limitations contained in this act." MCL 325.1003. The MSDWA separately addresses the production of bottled drinking water, and it states that it "shall not be construed as affecting, intending to affect, or in any way altering or interfering with common law water rights or the applicability of other laws providing for the protection of natural resources or the environment." MCL 325.1017(9). We conclude that plaintiff's proposed booster-pump facility is not a "public water supply" under the MSDWA, and the MSDWA does not constrain the Township to grant plaintiff's requested zoning approval.

VI. "PUBLIC CONVENIENCE AND NECESSITY"

Plaintiff contends that the ZBA improperly denied its permit on the basis of the last clause of § 21.3 of the Ordinance. In relevant part, that section provides as follows:

> The erection or construction of any building or structure for essential services, including but not limited to electrical substations, gas regulator stations, sanitary treatment facilities or other similar facilities shall be designed and erected to conform harmoniously with the general architecture and plan of such district in which they are to be erected, shall not interfere with the planned use of such district, and shall be subject to the prior approval of the Planning Commission. Plans and specifications for such building or structure shall be tendered to the Zoning Administrator and the Planning Commission as a prerequisite of such approval; furthermore, the Planning Commission shall have the power to permit any essential public service to erect and use an essential service building or structure in any permitted district, to a greater height or of a greater area than the district requirements established; provided such board shall find such structure or building necessary for public convenience and necessity.

At issue is whether the requirement to "find such structure of building necessary for public convenience and necessity" applies to *all* buildings or structures for essential services, or only to buildings or structures that exceed district height and size limitations.

-10-

Under the so-called "last antecedent rule," we generally treat a reference word or clause as modifying or referring to the immediately preceding word or clause, unless it is apparent that the legislative body intended a different construction. See *Haveman v Bd of Co Road Comm'rs for Kent Co*, 356 Mich 11, 18-19; 96 NW2d 153 (1959). However, punctuation is also "an important factor in determining legislative intent." *People v Beardsley*, 263 Mich App 408, 412; 688 NW2d 304 (2004). Generally, a semicolon is considered a major division between clauses, and a comma is considered a minor division between clauses. *Id*. at 413. A semicolon is also used to demark items in a list of elements that contain internal divisions. *Id*.

The Ordinance provision above is not a model of clarity. The "public convenience and necessity" clause is set off by a semicolon. In contrast, the "power to permit" clause is set off from the "greater height or area" clause by a comma. The "tender plans and specifications" clause is further set off by a semicolon *and* a "furthermore." We conclude that there are two plausible ways to make grammatical sense of the Ordinance provision, both of which arrive at the same outcome, and neither of which supports plaintiff's interpretation.

The first possibility is that the final sentence is a list of items, one of which contains an internal comma. If so, the entire final sentence is the modifying clause, and each of those items independently modifies the first sentence. In other words, the final sentence imposes three independent preconditions for the approval of the Planning Commission specified in the first sentence: (1) plans for the building or structure must be given to the planning commission and zoning administrator, (2) the planning commission has authority to allow the construction of buildings exceeding the usual dimensional requirements for any district, and (3) the commission must first find that any structure is "necessary for the public convenience and necessity" before approving its construction. Because the three preconditions are separated by semicolons, they operate independently. Because the "public convenience and necessity" requirement stands alone, it was error to conclude that plaintiff did not need to establish public convenience and necessity.

Under the second possibility, the semicolon combined with "furthermore" could constitute an even stronger demarcation than a semicolon standing alone. If so, then the "public convenience and necessity" clause would modify only the immediately preceding clause. The immediately preceding clause would be

> the Planning Commission shall have the power to permit any essential public service to erect and use an essential service building or structure in any permitted district, to a greater height or of a greater area than the district requirements established

in its entirety. The comma establishes that the above clause is a list containing two items, or it contains two sub-clauses. In either event, the "public convenience and necessity" clause necessarily modifies *each* of those items. Thus, the power to permit buildings or structures in any district is subject to a finding of public convenience and necessity, *and* the discretion to allow a height or area departure is also subject to a finding of public convenience and necessity. This construction would, again, require plaintiff to establish public convenience and necessity before the planning commission could exercise its power to permit construction of a building or structure.

Finally, although the so-called "absurd result rule" cannot override the plain language of a statute, any ambiguity should be resolved to avoid absurdity to the extent consistent with the statute's plain language. *Piccalo v Nix*, 466 Mich 861, 861; 643 NW2d 233 (2002); *Rafferty v Markovitz*, 461 Mich 265, 270; 602 NW2d 367 (1999). To the extent the Ordinance could be deemed ambiguous, it is proper to consider whether a possible construction makes rational sense and comports with the clear intent of the legislative body. Dimensional variances are already the subject of an entire chapter of the ordinance, which requires extensive and specific factual findings. See § 3.2 of the Ordinance. In contrast, § 2.8 of the ordinance addresses services but not buildings. Consequently, it would make no sense, and would seem contrary to the intentions apparent from the Ordinance as a whole, to impose a "public convenience and necessity" analysis solely upon whether to permit a departure from building height and area requirements.

Ultimately, our above analysis does not affect the outcome of this matter, because we have already determined that plaintiff's proposed booster-pump facility will not provide essential services. However, even if it did, we would conclude that under any reasonable construction of the Ordinance, the board is required to find the facility "necessary for public convenience and necessity" to grant a permit. We do not, however, need to inquire into whether the facility *is* necessary for public convenience and necessity. We express no opinion as to that question.

## VII. PERMITTED ACCESSORY BUILDING

Plaintiff next contends that it is entitled to a permit because its proposed booster-pump facility will be an "accessory building" under § 12.1 of the Ordinance. Under § 12.1, an "accessory use or accessory building" means:

> A detached building or portion of a building which is supplementary and/or subordinate to a main building or use on the same lot, occupied by or devoted exclusively to an accessory use.

Plaintiff contends that an accessory building requires only a permit from the zoning administrator, pursuant to § 10.3 of the ordinance. However, § 10.3 applies to "accessory buildings *specifically used for agricultural purpose*" (emphasis added). As we have discussed above, plaintiff's proposed booster-pump facility cannot be considered "for agricultural purpose." Consequently, we cannot agree that plaintiff would necessarily be entitled to a permit solely for being an "accessory building."

In any event, we disagree that plaintiff's proposed booster-pump facility does constitute an "accessory building." In particular, we disagree with plaintiff's contention that its facility will be supplementary or subordinate to the main use on the lot. Neither "supplementary" nor "subordinate" are defined in the Ordinance. A "supplement" means, in relevant part, "something that completes or makes an addition," and "supplementary" refers to serving as a supplement. *Merriam-Webster's Collegiate Dictionary* (11th ed). Thus, "supplementary" refers to something at least nominally relating to the original. "Subordinate" means, in relevant part, "placed in or occupying a lower class, rank, or position;" "submissive to or controlled by authority;" or "to make subject or subservient." *Id*. Again, "subordinate" requires a relationship between two things beyond mere tolerated proximity. Plaintiff's argument that "subordinate" is synonymous with "secondary" would impermissibly rewrite the Ordinance.

Plaintiff correctly observes that this Court in *Groveland Twp v Jennings*, 106 Mich App 504, 512-513; 308 NW2d 259 (1981), relied on distinguishable terminology. However, we independently arrive at approximately the same conclusion. Under the Ordinance here, an "accessory use" or "accessory building" must have some functional relationship to, and be in actual furtherance of, the main building or main use. Under the circumstances, we need not address how close a relationship is required. The main use on the lot is a youth camp, and the relationship between plaintiff's booster-pump facility and the youth camp is one of mere sufferance. Therefore, no functional relationship exists.

## VIII. DISCRETION

Plaintiff contends that defendant was required by MCL 125.3504(3) to grant its permit. That statute provides that "[a] request for approval of a land use or activity shall be approved if the request is in compliance with the standards stated in the zoning ordinance, the conditions imposed under the zoning ordinance, other applicable ordinances, and state and federal statutes." However, MCL 125.3504(4) permits the imposition of "reasonable conditions" for approval of a permit, which may include conditions intended "to protect the natural environment and conserve natural resources" or "to promote the use of land in a socially and economically desirable manner." Thus, we are not persuaded that MCL 125.3504(3) imposes as necessarily mandatory an obligation as plaintiff contends. In any event, as discussed above, plaintiff's proposal does not comport with the Ordinance.

Finally, plaintiff notes that it faced considerable local opposition to its water bottling operation, which plaintiff contends may have improperly influenced members of the ZBA or planning commission. We agree in part, to the extent that localities may not violate the law simply because popular opinion favors doing so. See *Poirier v Grand Blanc Twp*, 167 Mich App 770, 777; 423 NW2d 351 (1988) (observing that a locality cannot legitimize an unconstitutional zoning classification on the basis of a referendum vote). Nevertheless, Michigan has always regarded the right of the people to locally elect their local government officials as important to the rights of all. See *Brouwer v Kent Co Clerk*, 377 Mich 616, 640-641, 649-658; 141 NW2d 98 (1966) (SOURIS, J.). It is a necessary inference that local officials *should* be sensitive to local concerns. ZBAs are vested with some degree of discretion. See MCL 125.3636(1)(d). To the extent a commission or board does not exceed the constraints imposed upon them by law, which we conclude did not occur in this matter, it would be improper for them to *fail* to take popular opinion into account.

## IX. CONCLUSION

For any or all of the above reasons, we conclude that the trial court erred in reversing the decision of the ZBA to refuse plaintiff's requested permit, and we conclude that the ZBA properly denied the request. The circuit court is therefore reversed. We direct that the parties shall bear their own costs on appeal, an important question of public interest being involved. MCR 7.219(A).

/s/ Cynthia Diane Stephens
/s/ Deborah A. Servitto
/s/ Amy Ronayne Krause

-13-